941 P.2d 1275

**STATE of Arizona, and the DEPART-MENT OF ADMINISTRATION, Plaintiffs–Appellants.**

v.

**Colleen SCHALLOCK, a single person; Bertha A. Saunders, a married person, Defendants–Appellees.**

**No. CV–95–0565–PR.**

Supreme Court of Arizona, En Banc.

July 17, 1997.

Grant Woods, Arizona Attorney General by Thomas J. Dennis, Phoenix, for State of Arizona and Department of Administration.

Schleier Law Offices, P.C. by Tod F. Schleier, Bradley H. Schleier, Phoenix, for Colleen Schallock.

Dillingham, Keilp & Cross, P.C. by John L. Dillingham, Phoenix, for Bertha A. Saunders.

## OPINION

FELDMAN, Justice.

The state filed an action seeking a declaration that it had no duty to defend or indemnify Allen Heinze, the former executive director of the Arizona Prosecuting Attorneys Advisory Council, in two cases seeking damages for sexual harassment. The state argued indemnification was not available in either case because Heinze's acts were not in the course and scope of employment. On cross-motions for summary judgment, the trial court ruled that the state must indemnify Heinze. The court of appeals reversed, granting summary judgment in favor of the state. *See State v. Schallock,* 185 Ariz. 214, 914 P.2d 1306 (App.1995).

We granted review to decide two issues of statewide importance: first, whether collateral estoppel applies and, second, whether Heinze's actions were within the terms of the state's insurance coverage. We have juris-

diction pursuant to Ariz. Const. art. VI, § 5(3) and Ariz.R.Civ.App. 23.

## FACTS AND PROCEDURAL HISTORY

### A. Background

Colleen Schallock, a 23–year–old law student, clerked during the summer of 1988 with the Arizona Prosecuting Attorneys Advisory Council (APAAC). Bertha Saunders was a secretary at APAAC. Allen Heinze was the executive director of APAAC and answerable only to its members, a collection of county attorneys and other government officials who meet quarterly to coordinate the training of and assistance to prosecutors.[1] Schallock and Saunders both filed lawsuits against Heinze and APAAC seeking damages for sexual harassment.

Given the procedural posture of this action, we view the facts in the light most favorable to Schallock and Saunders. Over a period spanning almost a decade, Heinze often made off-color comments, vulgar gestures, and sexual jokes, and inappropriately touched the women in the office. Work conditions were such that women employees would not work late unless a male staff attorney was also there. One former APAAC staff member described Heinze's treatment of women employees as "like his personal harem." Between June 1984 and fall 1990, Heinze "engaged in multiple acts of sexual misconduct, including touching Saunders' crotch, buttocks, and breasts, running his hands over her arms, shoulders and the top of her chest, placing his arms around her in an attempt to force her to kiss him, unzipping his pants, unfastening his belt, and simulating sexual intercourse from behind." While both were attending a seminar in June 1984, Heinze entered Saunders' hotel room, made sexual comments, and asked her to engage in sexual intercourse. He then forced himself upon Saunders, pressing against her.

Similarly, Heinze at least twice touched Schallock's breasts and put his hand down her skirt. At a conference in Sedona in the summer of 1988, Heinze propositioned Schallock, telling her he would help her get a job in Phoenix and at the same time placing his hand on her thigh under a table. Schallock told him that was not the way she wanted to get a job. Later in the evening in a hotel room, Heinze raped Schallock. Afterward he told her he would give her a job at any amount of money she wanted. In December 1988, when Schallock was no longer working at APAAC, Heinze insisted she have lunch with him. He assaulted her again after the lunch. When she threatened to reveal the rape, he told her he was a powerful political figure and would "take her down with him."

### B. Schallock's tort action

In her complaint, Schallock alleged (1) Heinze personally and APAAC vicariously were liable for a public policy tort (sexual harassment); (2) APAAC independently was liable for damages on the theory of negligent retention; and (3) Heinze personally and APAAC independently and vicariously were liable for intentional infliction of emotional distress. Heinze believed he would be indemnified by state insurance for any judgment against him and his wife. The state, however, reserved its rights if a court subsequently determined that Heinze's acts were outside the coverage or indemnity provided by A.R.S. § 41–621.[2] Asserting his Fifth Amendment rights, Heinze refused to give evidence in Schallock's tort case.

---

1. *See* A.R.S. § 41–1830 *et seq.*, creating and defining the functions of APAAC. Title 41 of the Arizona Revised Statutes covers "State Government." APAAC was created pursuant to § 1830 of the title. APAAC is a council consisting of county attorneys, the Attorney General or his designee, one of the state's two law school deans, the chief prosecutor for a city larger than 250,-000 people, one full-time prosecutor appointed by the Governor to represent smaller cities, and the Chief Justice of the Supreme Court or his designee. The Council meets quarterly to coordinate the state's prosecutors, formulate rules for prosecution, and assist prosecutors by providing various research and training programs. The

Director of the Administrative Office of the Courts is the Chief Justice's present designee to APAAC.

2. **§ 41–621 Purchase of insurance; coverage; limitations; exclusions; definition**

    A. The department of administration shall obtain insurance against loss, to the extent it is determined necessary and in the best interests of the state as provided in subsection E of this section, on the following:

      \*    \*    \*    \*    \*    \*

    3. The state and its departments, agencies, boards and commissions and all officers,

After trial, the jury returned three verdicts for Schallock and against APAAC and Heinze. In the first verdict, the jury found Heinze liable for "intentional or reckless infliction of emotional distress, and/or sexual harassment in the workplace, and ... the full damages to be $1,476,535.50."[3] In its second verdict (form 3), the jury stated APAAC was liable "for intentional infliction of emotional distress, and/or sexual harassment in the workplace and ... the full damages to be $908,446.50." In its third verdict (form 6), the jury found APAAC liable for "negligent hiring and full damages to be $908,446.50." Given the jury's answer to the accompanying interrogatory, we interpret this verdict as finding APAAC directly liable for negligent hiring, supervision, and retention of Heinze based on evidence that (1) Heinze had been dismissed from previous employment with a law enforcement agency because of charges of sexual impropriety, a fact allegedly known to one or more APAAC members when Heinze was hired; and (2) Heinze's aberrant sexual activities with APAAC's employees extended over almost a decade and were known or should have been known to APAAC's members. The jury also wrote a note: "We want it to be clear that we have divided the liability in the following manner: Mr. Heinze $1,476,553.50 and APAAC $908,446.50 and total liability is $2,385,000."

Before trial, the state and Schallock made a "high-low" agreement, providing a formula for a guaranteed payment to Schallock; in return, if a verdict were returned against APAAC, Schallock agreed to dismiss the action against it. Therefore, although verdicts 3 and 6 were returned on the claims presumably establishing APAAC's direct and vicarious liability, judgment was never entered on those verdicts. Instead, complying with the settlement agreement, Fireman's Fund, the state's insurer, paid Schallock $725,000 in full settlement of the $908,000 verdict against APAAC. We assume the $1.4 million verdict against Heinze, which was eventually reduced to judgment, remains unpaid.

## C. The state's declaratory judgment action

During the course of the tort litigation, the state filed this declaratory judgment action

agents and employees thereof ... against liability for acts or omissions of any nature *while acting in authorized governmental or proprietary capacities and in the course and scope of employment or authorization* except as prescribed by this chapter.

\* \* \* \* \* \*

D. The department of administration may determine, in the best interests of the state, that state *self-insurance is necessary or desirable* and, if that decision is made, shall provide for state self-insurance for losses arising out of state property, liability or worker's compensation claims prescribed by subsection A of this section. If the department of administration provides state self-insurance, such coverage shall be excess over any other valid and collectible insurance.

(Emphasis added.) The department evidently obtained insurance from Fireman's Fund under subsection (A), but the policy was apparently exhausted and the state became a self-insurer under subsection (D).

3. The jury was given various verdict forms and interrogatories to answer. The verdict form used depended on the answers to the interrogatories. The verdicts returned by the jury were:

VERDICT FORM 1: Jury to use this form if the jurors answered either or both of the following questions in the affirmative. The jurors answered both in the affirmative.

1. Was Heinze liable to Schallock for intentional or reckless infliction of emotional distress?
2. Was Heinze liable to Schallock for sexual harassment in the work place?

VERDICT: Jury found for Schallock and against Heinze for intentional or reckless infliction of emotional distress, and/or sexual harassment in the workplace. Full damages: $1,476,553.50 (handwritten in is "total $2,389,000").

VERDICT FORM 3: Jury to use this form if the jurors answered either of the following questions in the affirmative. The jurors answered both affirmatively.

1. Was APAAC liable for intentional or reckless infliction of emotional distress?
2. Was APAAC liable for sexual harassment in the work place?

VERDICT: Jury found for Schallock and against APAAC for intentional infliction of emotional distress, and/or sexual harassment in the workplace. Full damages: $908,446.50.

VERDICT FORM 6: Jury to use this form if the jurors answered the following question in the affirmative. The jurors answered affirmatively.

1. Was APAAC at fault for negligently hiring, supervising, and retaining Heinze?

VERDICT: Jury found for Schallock and against APAAC on the negligent hiring, retention, and supervision claim. Full damages: $908,446.50.

claiming it could not indemnify Heinze for Saunders' and Schallock's claims because his acts were outside the course and scope of his employment. In Schallock's trial, the judge directed a verdict on the vicarious liability issue, finding no factual support for the state's contention that Heinze's actions were not in the course and scope of his authority as APAAC's director. However, because the verdict was never reduced to judgment, the order directing a verdict on course and scope was never merged in a final judgment or appealable order.

Because there was no judgment entered, the state claims there is no collateral estoppel on the issue of course and scope and the directed verdict therefore cannot be used to establish course and scope for insurance purposes under A.R.S. § 41–621(A)(3). On cross-motions for summary judgment, the trial judge in the declaratory judgment action relied on the doctrine of collateral estoppel flowing from the directed verdict in the tort case and concluded that under § 41–621 the state was required to indemnify Heinze.

**D. The court of appeals' opinion**

Putting aside as irrelevant the issue of APAAC's direct liability, the court of appeals characterized the question as whether the state must indemnify a state employee against his personal liability for sexual harassment. The court of appeals held there was no collateral estoppel on the issue of course and scope because the directed verdict was never reduced to judgment. It then concluded as a matter of law that Heinze's "tortious acts were not in the course and scope of his employment" and therefore A.R.S. § 41–621 "does not extend Heinze indemnity for his conduct." *Schallock*, 185 Ariz. at 218, 914 P.2d at 1310. The court vacated the summary judgment granted in favor of Schallock and ordered the trial judge to enter judgment in favor of the state, in effect granting its motion for summary judgment.

We granted review to consider only two questions:

1. Whether collateral estoppel applies where a party has fully litigated the issue to a verdict but a judgment has not been entered because of a settlement between the parties.

2. Whether Heinze's actions were within the terms of the coverage provided by the state insurance pursuant to A.R.S. § 41–621.

## DISCUSSION

### A. Collateral estoppel and the directed verdict

#### 1. What was decided on course and scope

■ A review of the trial court record in this action reveals ample evidence that at least some APAAC members knew of Heinze's improper conduct. Relevant portions of the transcripts and depositions taken in the tort case were part of the declaratory judgment action record. In those depositions, APAAC staff attorneys admitted having seen Heinze fondle female employees and force them to kiss him at holiday parties, and heard him use crude and sexually explicit language. Likewise, some Council members heard Heinze use rough, sexually explicit language and had received complaints from outside attorneys about Heinze's use of pejoratives of a sexual nature. Finally, at a conference in May 1988, a former clerk spoke with a Council member and a former APAAC employee about Heinze's propensity to treat women employees as his harem. The clerk had also complained to the staff attorneys about the unwanted attention from Heinze, to no avail. Thus, as the court of appeals acknowledges, there was evidence in the tort case from which the judge could have found as a matter of law that Heinze's actions were or should have been known to some Council members. *Schallock*, 185 Ariz. at 218, 914 P.2d at 1310. However, because the entire evidentiary record from the tort case is not before us, it is impossible to fully ascertain the grounds on which the judge based his directed verdict ruling.

#### 2. Chaney Building *and* Chemetron

■ The first issue on which we granted review was whether the doctrine of collateral estoppel applies to the directed verdict in the tort case and precludes the state from argu-

ing the issue of course and scope in the present coverage case. If so, the directed verdict ruling would have concluded the state's indemnity obligation for Heinze's torts under the coverage provisions of A.R.S. § 41–621(A).

■ The court of appeals held the directed verdict did not collaterally estop the state from denying coverage in either Schallock's or Saunders' case. Both the court of appeals and the state relied on *Chaney Bldg. Co. v. City of Tucson* to support the argument that the issue was not fully litigated and therefore does not preclude further litigation. In *Chaney*, we held collateral estoppel applies to an issue if (1) it has been actually litigated, and (2) final judgment has been entered. 148 Ariz. 571, 573, 716 P.2d 28, 30 (1986). Schallock and Saunders argue that numerous cases from states other than Arizona, particularly *Chemetron Corp. v. Business Funds, Inc.*, support the proposition that the issue was fully litigated despite the lack of a final judgment. They cite *Chemetron*'s holding that the party against whom collateral estoppel is being used offensively, as in Saunders' case, need only have had a "full and fair opportunity to litigate the issue in the prior case." 682 F.2d 1149, 1189 (5th Cir.1982).

Arizona case law already directly addresses this problem. *See City of Glendale v. Aldabbagh*, 939 P.2d 418 (Ariz.Sup.Ct.1997) (findings at preliminary injunction hearing *not sufficient to permit application of* collateral estoppel doctrine because case settled before final adjudication). Thus, because no judgment was entered, the verdict does not rise to the level required for collateral estoppel.

> There is, of course, a fundamental difference between a verdict and a judgment, the one being the jury's finding on the facts; and the other, the Judge's determination of the case upon the verdict. A verdict, before judgment has been entered thereon, has no finality, cannot be executed and cannot be pleaded in bar as *res judicata* or offered in evidence as collateral estoppel.

*State v. Williams*, 131 Ariz. 211, 213, 639 P.2d 1036, 1038 (1982) (quoting *Neely v. State*, 210 Tenn. 52, 356 S.W.2d 401 (1962))

(citations omitted). This position is further supported by the commentators in 50 C.J.S. *Judgments* § 697 ("A verdict on which no judgment was entered … is not, as a rule, conclusive on the parties in a subsequent suit.") and 46 Am.Jur.2d *Judgments* § 563 ("[T]he application of the doctrine [of res judicata] may not be predicated upon a verdict … upon which no judgment is rendered. . . .").

## B. Course and scope for purposes of indemnification

The second issue on which we granted review was whether the state must indemnify Heinze because his actions were within the course and scope of his employment. This does not quite state the issue briefed and argued. Because Heinze was found liable in the tort action and the state has satisfied its direct liability to Schallock under the settlement agreement, the correct issue in the declaratory judgment action is whether the state must indemnify Heinze for the judgment against him. At this point, the state is evidently a self-insurer providing coverage under A.R.S. § 41–621(D), which provides for "self-insurance for losses arising out of state … liability … [as] prescribed by subsection A of this section."

As both the trial judge and court of appeals correctly saw it, the central issue is whether Heinze's conduct was within the coverage extended by subsection A, which provides indemnity for an officer acting within "the course and scope of employment or authorization." Of course, when the officer acts in that manner, the state ordinarily will be vicariously liable. *See* RESTATEMENT (SECOND) OF AGENCY (hereinafter RESTATEMENT) § 219 *et seq.* The insurance statute thus understandably provides coverage for the officer in those situations in which the state itself could be held liable.

### 1. Interpreting course, scope, and authorization

We turn, as did the court of appeals and trial court, to the nature of Heinze's actions. On this issue, the trial judge in the tort case instructed the jury as follows:

If you find that Defendant Heinze intentionally inflicted emotional distress upon Plaintiff, then you must determine if Defendant APAAC is responsible for his actions.

1. Defendant APAAC is subject to liability for the actions of Defendant Heinze committed while acting *in the scope of his employment.* To hold an employer liable, an employee must:

a) have acted within the scope of his employment;

b) be subject to the employer's control or right of control;

c) have acted in furtherance of the employer's business.

An employee's conduct is within the scope of employment if and only if;

a) it is the kind he is employed to perform;

b) it occurs substantially within authorized time and space limits; and

c) it is motivated, at least in part, by a purpose to serve the employer.

2. Defendant APAAC is subject to liability for the actions of Heinze *acting outside the scope of his employment, if;*

a) Defendant APAAC intended the conduct or the consequences; *or*

b) Defendant APAAC was negligent or reckless; *or*

c) *Defendant Heinze purported to act or speak on behalf of Defendant APAAC and he was aided in accomplishing his misconduct by the existence of the agency relationship.*

(Emphasis added.) The instruction, taken almost verbatim from RESTATEMENT § 219, contains two separate theories of vicarious liability. Part 2(c) paraphrases the words of § 219(2)(d), which, as we shall see later, deals with the master's vicarious liability for torts a servant was empowered to commit because of the master's delegation of authority.

The court of appeals noted the "state correctly asserts that 'Heinze is provided coverage [by the statute] only if his acts were performed ... in the course and scope of employment or authorization.' Schallock and Saunders respond that 'so long as the tort complained of was caused incidental to the

exercise of the supervisory power, Heinze must be deemed as acting within the course and scope of his employment.'" *Schallock,* 185 Ariz. at 219, 914 P.2d at 1310.

In concluding that Schallock's position was incorrect, the court of appeals relied on its prior decision in *Smith v. American Express Travel Related Services Co.,* which held the employer was not vicariously liable for a supervisor's harassment and sexual assaults on an employee because the supervisor's acts were not expressly or impliedly authorized by the employer or in furtherance of its business. 179 Ariz. 131, 136, 876 P.2d 1166, 1171 (1994). The language of *Smith,* standing alone, would mean that an employer is never vicariously liable for an intentional tort. We believe this sweeps much too broadly. In addition, we note that in *Smith* the evidence did not establish the employer's actual or constructive knowledge of the supervisor's conduct. Thus, even if correctly decided, *Smith* is much different than the case before us, as can be seen from the court's language:

> [N]o evidence exists from which a reasonable juror could conclude that [the employer] knew about [the supervisor's] sexual misconduct and ratified it.... Finally, no evidence exists in this record from which a reasonable juror could conclude that [the employer] knew or should have known that [the supervisor] had created a sexually offensive working environment and thus was capable of sexual assault.

*Id.* at 137, 876 P.2d at 1172. We do not believe *Smith* is applicable here and turn therefore to an analysis of agency law.

### 2. *Law of agency—factors peculiar to supervisory sexual harassment cases*

In *Schallock* the court of appeals stated, "[f]ollowing *Smith* and the RESTATEMENT (SECOND) OF AGENCY, we hold that Heinze did not act in the course and scope of employment.... Though Heinze used his broad supervisory authority as a license for sexually predatory acts, these acts were not intended to serve APAAC but himself." *Schallock,* 185 Ariz. at 218, 914 P.2d at 1310. The court then rejected Schallock's contrary argument because it "confuses elements of independent

and vicarious liability [4] and obscures the traditional lines of course and scope." *Id.*

We disagree with the court of appeals on several grounds. First, given the facts of this case, we do not believe it can be said as a matter of law that Heinze was outside the course and scope of authority with regard to many or most of the incidents alleged by Saunders and Schallock. Second, the court has overlooked entirely the question of authorization: the statute grants indemnity for acts done within "course and scope *or* authorization." A.R.S. § 41–621(A)(3) (emphasis added). Finally, the court has conflated principles required to establish a master's direct liability in tort with those necessary to find vicarious liability.

■ Before addressing these issues, it is important to note four special factual and legal considerations in cases of the present type. First, this case involves claims of a managing officer's sexual harassment of subordinate employees over whom he had power to hire and fire, promote and demote, instruct and control. This distinguishes the case from the great majority of cases involving torts committed by a servant against either a non-employee or co-employee. Language used in such cases is sometimes inapplicable to cases involving a managing officer's harassment of a subordinate. *See* David Benjamin Oppenheimer, *Exacerbating the Exasperating: Title VII Liability of Employers for Sexual Harassment Committed by Their Supervisors*, 81 CORNELL L.REV. 66, 71 (1995). Second, the law of agency governs both commercial relations and master-servant relations. We must be careful to apply only those rules that pertain to the latter situation. *Id.* Third, phrases such as "course and scope of employment" and "scope of authority" carry the gloss of historical meaning and policy considerations much more complex than the words themselves indicate. *See Doe v. Samaritan Counseling Center,* 791 P.2d 344, 349 (Alaska 1990) (quoting *Fruit v. Schreiner,* 502 P.2d 133, 140–41 (Alaska 1972)). Finally, in determining course and scope in a sexual harassment

case, we must realize that employers never adopt resolutions authorizing sexual harassment. Nor do they grant such authority in job descriptions or employment manuals. Oppenheimer, *supra,* 81 CORNELL L.REV. at 84; *Faragher v. City of Boca Raton,* 111 F.3d 1530, 1541 (11th Cir.1997) (Barkett, J., concurring in part, dissenting in part). In the absence of written controls, a firm's policies set the limits both on what is tolerated or permitted and on the authority given its supervisors.

With these considerations in mind, we address the specifics of the present case.

### 3. The Restatement rule

■ We believe the court of appeals erred in concluding the RESTATEMENT compelled them to grant summary judgment to the state. The principles expressed by the RESTATEMENT do not permit judgment for the state as a matter of law. Conduct within the scope of employment may be either of the same nature as that authorized *or* incidental to that authorized. RESTATEMENT § 229(1). Many factors are to be considered in determining whether conduct not expressly authorized is so incidental as to be within course and scope, including time and place of the conduct. *Id.* § 229(2)(b). Almost all of Heinze's improper acts took place at AP-AAC's office or a related location, such as a seminar site or training session, and were within or incidental to business hours or sessions.

■ Another factor is the previous relation between master and servant. *Id.* § 229(2)(c). Taking Schallock's case at its strongest, as we must on summary judgment, APAAC was aware for close to a decade that Heinze, the person managing its affairs, was engaged in egregious improprieties and did little or nothing to call a halt. A jury might well choose not to believe claims that these acts were unauthorized and outside the course of employment when the employer permitted them to occur and recur over a long period at its place of business and dur-

4. *But see* RESTATEMENT § 213, cmt. h, "In a given case the Employer may be liable both on the ground that he was personally negligent and because the servant's conduct was within the scope of employment."

ing business hours. In addition to evidence of Council members' actual knowledge, there is considerable evidence that the abusive working conditions created by Heinze were so pervasive that a jury could infer APAAC was aware of the way Heinze ran its business and by permitting such conditions to continue authorized his abusive acts. *See Faragher*, 111 F.3d at 1538, and cases cited.

■ A third relevant factor is whether "the master has reason to expect that such an act will be done." RESTATEMENT § 219(2)(b). One can hardly be surprised when sexual harassment that has occurred for years continues. A jury might well find that if APAAC was aware of the work environment Heinze created, it should have anticipated even the final sexual assaults and rapes with which Heinze is charged in these cases.

■ Some aspects of this case seemingly favor a finding that Heinze's actions were not in the scope and course of employment. One is the purpose of the acts: to be within the course and scope, the act must be, at least in part, motivated by a purpose to serve the master rather than solely to serve personal motives unconnected to the master's business. RESTATEMENT § 235. But here again, and particularly in a sexual harassment case, the act in question is not the ultimate tortious act but rather conduct related to the tort. In fondling the file clerks and offering advancement for sex, Heinze was both serving the master by running the office—a task he was explicitly authorized to do—and serving his personal desires. That his motives were mixed is of consequence, but the mixed motives cut both ways. *See* RESTATEMENT §§ 235 & 236. In *Doe*, the Alaska Supreme Court reviewed the cases and concluded that an improper sexual relationship initiated by a pastoral counselor during therapy sessions with a patient satisfied the "motivation to serve" test because it was incidental to the servant's legitimate work activity—therapy.

791 P.2d at 347–48; *see also Perez v. Van Groningen & Sons*, 41 Cal.3d 962, 227 Cal. Rptr. 106, 719 P.2d 676 (Cal.1986) (while driving master's equipment, servant gave plaintiff ride for personal reasons); *Samuels v. Southern Baptist Hospital*, 594 So.2d 571, 573–74 (La.App.1992) (rape of patient by nursing assistant); Oppenheimer, *supra*, 81 CORNELL L.REV. at 66, 82–84. The relevant purpose to be ascertained is not whether Heinze had authority to harass—no supervisor has that authority—but whether he had authority to run and was running APAAC's business. *See* RESTATEMENT § 235, cmt. b.

This principle has been recognized in Arizona. In *State v. Pima County Adult Probation Department*, several probation officers sought coverage under A.R.S. § 41–621(A)(3) against a damage claim asserted because a probationer under the department's supervision had been allowed contact with juveniles, in direct violation of the superior court's order. The state argued that because the probation officers intentionally violated the court's express instructions, they were not acting within the course and scope of employment and thus were not entitled to coverage. The court of appeals rejected that claim, holding that in supervising the probationer, the officers acted in the course and scope of their employment because the act of supervision was their employer's business. The fact that they violated express instructions was an element to be considered but not conclusive on the question of course and scope. 147 Ariz. 146, 149, 708 P.2d 1337, 1340 (App. 1985). So long as the officers were subject to the department's control or right of control and were in general acting in furtherance of the department's business, they were within the course and scope. *Id.* at 149–50, 708 P.2d at 1340–41. *See Faragher*, 111 F.3d at 1536 (If "the act was the agent's way of accomplishing some authorized purpose, then the master cannot avoid liability even if he has given specific, detailed and emphatic instructions to the contrary.");[5] W. PAGE KEE-

---

5. This is not a new principle. Judge Barkett's opinion relies on Justice Story's 1857 COMMENTARIES ON THE LAW OF AGENCY:

[A principal] is held liable to third persons in a civil suit for the frauds, deceits, concealments, misrepresentations, torts, negligences, and oth-

er malfeasances, or misfeasances, and omissions of duty, of his agent, in the course of his employment, although the principal did not authorize, or justify, or participate in, or, indeed, know of such misconduct, or even if he forbade the acts, or disapproved of them.

TON, ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 70, at 507 (5th ed.1984) (describing "tendency" in later cases to find course and scope when the "employment has provided a peculiar opportunity and even incentive" for servant's intentional tort).

Other factors to be considered include the seriously criminal nature of the acts and extent of departure from normal methods of operation. *See* RESTATEMENT § 229(2)(i) & (j). But acts may be found in the scope even if "forbidden or done in a forbidden manner," and even if consciously criminal or tortious. RESTATEMENT §§ 230 and 231.

The acts complained of here were part of or incidental to Heinze's employment by APAAC, even though done to satisfy Heinze's aberrant desires. Heinze was in complete charge of APAAC's day-to-day operation. Conduct done "with no intention to perform it as part of a service for which the servant is employed" is ordinarily outside the scope. RESTATEMENT § 235. Heinze's conduct, however, was incidental to his position and authority as APAAC's executive director.

We therefore conclude that the court of appeals' reliance on the RESTATEMENT OF AGENCY to support summary judgment on the issue of course and scope was misplaced. Under RESTATEMENT principles, the RESTATEMENT factors that apply to the facts of this case create a jury question. But we do not rely on the RESTATEMENT alone. We believe analysis of case law dealing with similar situations leads to the same conclusion.

### 4. Federal cases on course and scope in sexual harassment cases

In *Smith*, the court of appeals discounted the federal cases, reasoning that liability under cases dealing with Title VII [6] "is much broader than common law tort liability." *Smith*, 179 Ariz. at 135, 876 P.2d at 1170. We again disagree with *Smith*, believing the United States Supreme Court's decision in *Meritor Savings Bank v. Vinson* instructed federal courts to take agency law as a guide in determining employer liability for a super-

111 F.3d at 1541 (quoting Joseph Story, COMMENTARIES ON THE LAW OF AGENCY § 452, at 536–37 (5th ed. 1857)).

visor's acts of sexual harassment when deciding a Title VII case. 477 U.S. 57, 71–72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986).

Chief Justice Rehnquist, writing for the Court, proclaimed no unique rule for determining vicarious liability in cases dealing with a supervisor's sexual harassment. Instead, the Court rejected the administrative agency's view that an employer is absolutely or strictly liable for a supervisor's actions and directed the district courts as follows:

> Congress wanted courts to look to agency principles for guidance in this area. While such common law principles may not be transferrable in all their particulars to Title VII, Congress' decision to define employer to include any "agent" of an employer, ... surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible. For this reason, we hold that the court of appeals erred in concluding that employers are always automatically liable for sexual harassment by their supervisors. *See generally* RESTATEMENT (SECOND) OF AGENCY § 219–237 (1958). For the same reason, absence of notice to an employer does not necessarily insulate that employer from liability.

*Id.* at 72, 106 S.Ct. at 2408. Following *Meritor*, most if not all circuit court decisions dealing with Title VII sexual harassment actions have applied the common law of agency to determine the employer's vicarious liability. *See* Katherine Philippakis, Comment, *When Employers Should be Liable for Supervisory Personnel: Applying Agency Principles to Hostile–Environment Sexual Harassment Cases*, 28 ARIZ. ST. L.J. 1275, 1279 (1997). For that reason, we believe post-*Meritor* Title VII cases apply common-law agency principles and should be considered.

The federal cases cover both *quid pro quo* and hostile work environment situations. A *quid pro quo* claim is one in which the offender conditions job benefits or advancements on the employee's performance

6. We use "Title VII" to describe the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–17 (1988).

of sexual favors, while a hostile-environment claim is one in which the offender creates a sexually "hostile or offensive working environment." *Id.* at 1276; *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2404. Given these definitions, both types of claims are raised by the facts here.

In *quid pro quo* cases, applying traditional agency principles, many courts have held an employer liable because a *quid pro quo* harasser

> is able to grant such job benefits or detriments only because he has actual or apparent authority to do so delegated to him by his employer.... Under traditional agency principles the exercise of such actual or apparent authority gives rise to liability on the part of the employer under a theory of respondeat superior. *See* RESTATEMENT (SECOND) OF AGENCY § 219(2)(d) (1958).

*Nichols v. Frank,* 42 F.3d 503, 514 (9th Cir. 1994) (collecting cases).

Some hostile environment cases have found a jury question with regard to vicarious liability. In a case similar to ours, the plaintiff had both hostile environment and *quid pro quo* claims. The harasser was not only her immediate supervisor but the corporate vice president in charge of managing the hotel property where the plaintiff worked. He had full authority to determine employee benefits and to hire, fire, promote, and discipline the employees. *Martin v. Cavalier Hotel Corp.,* 48 F.3d 1343, 1348 (4th Cir. 1995). The circuit court affirmed judgment against the employer, stating that it was following *Meritor* and applying the common law of agency in determining the question of vicarious liability. *Id.* at 1350. In applying those "principles in the context of this case," the court stated:

> [W]hether an employee's acts are within the scope of his employment requires an examination of *when* the act took place, *where* it took place, and whether it was *foreseeable. See generally* RESTATEMENT (SECOND) OF AGENCY §§ 210 to 245 (1958). (Emphasis in original.) An employer may be liable for an employee's acts even if the employee's motive is not to benefit the employer, to advance his self interest rather than the interest of his employer....

> A forbidden or even consciously criminal or tortious act may still be within the scope of employment.... Indeed an employer may be liable for its employee's unauthorized use of force if such use was foreseeable in view of the employee's duties.... *The test of the liability of the employer for the tortious act of the employee is not whether the tortious act itself is a transaction within the ordinary course of the business of the employer or within the scope of the employee's authority, but whether the service itself in which the tortious act was done was within the ordinary course of such business or within the scope of such authority....*

> Here Bachelor's assaults took place in the work place, during working hours, on an employee whom he had authority to hire, fire, promote, and discipline. There is no question that such sexual assaults were foreseeable;.... Thus, under common law agency principles Bachelor was acting within the scope of his employment with Cavalier and so Cavalier is liable for Bachelor's assaults on Martin. To be sure, ... Bachelor's assaults on Martin were "outrageous and violative of his employer's rules." Nonetheless, those assaults arose out of Bachelor's management of the hotel,.... At the very least, because Bachelor's "willful and malicious acts were committed while he was performing his employment duties" there is here ... sufficient evidence to present "a jury issue" as to whether Bachelor was acting "within the scope of his employment" with Cavalier.

*Id.* at 1351–52 (citations omitted, emphasis added) (quoting *Commercial Business Systems, Inc. v. Bellsouth Services, Inc.,* 249 Va. 39, 453 S.E.2d 261, 266 (Va.1995)); *see also Fields v. Sanders,* 29 Cal.2d 834, 180 P.2d 684 (1947); Philappakis, *supra,* 28 ARIZ. STATE L.J. at 1288 (any other interpretation of motive to serve the employer would be unduly constrained and antithetical to the RESTATEMENT position).

Many other federal cases have reached the same conclusion on more or less the same analysis, applying the RESTATEMENT and common law agency cases in both *quid pro*

*quo* and hostile environment cases. *See, e.g., Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 183–84 (6th Cir.1992) (court should look at "when the act took place, where it took place, and whether it was foreseeable" to determine whether supervisor's harassment occurred within course and scope of employment). *Kauffman* holds the employer is relieved of liability if the company learns of the hostile work environment created by its supervisor and takes prompt remedial action. *Id.* at 184. This part of the decision has been cogently criticized on the ground that prompt remedial action could insulate against direct liability for negligence and against punitive damage claims, but not against vicarious liability. Oppenheimer, *supra,* 81 CORNELL L.REV. at 132. We need not concern ourselves with this issue because the present record contains no evidence of remedial action prior to Schallock's filing her damage action.

Some federal cases have rejected employer course and scope liability absent evidence that the employer also knew or should have known of the hostile work environment created by the supervisor. *See, e.g., Nichols,* 42 F.3d at 508; *Henson v. City of Dundee,* 682 F.2d 897, 905 (11th Cir.1982). These cases have also been cogently criticized as confusing elements necessary for a finding of direct liability with those required for vicarious, course and scope responsibility. *See* Phillipakis, *supra,* 28 ARIZ. STATE L.J. at 1285; Oppenheimer, *supra,* 81 CORNELL L.REV. at 133–35 (citing cases). Again, though the criticism seems logical, we need not solve this problem because the partial record of the tort case indicates quite clearly that APAAC had either actual knowledge of the hostile work environment or at worst constructive knowledge because the conditions were so widespread and prevalent. *See Faragher,* 111 F.3d at 1538; *E.E.O.C. v. Mitsubishi Motor Mfg. of Am. Inc.,* 102 F.3d 869, 870 (7th Cir.1996) (where hostile work environment is pervasive, employer's knowledge may be imputed or inferred).

Notwithstanding the confusion and debate among the federal circuits, we conclude APAAC is not entitled to summary judgment on the course and scope issue in Schallock's and Saunders' hostile environment claims. The court of appeals thus erred in instructing the trial court to enter judgment for the state.

## C. Authorization

We believe the court of appeals also erred in overlooking the word "authorization" as used in A.R.S. § 41–621(A)(3), which provides coverage for officers acting in "course and scope of employment *or authorization.*" (Emphasis added.)

We note first that authorization must mean something other than the idea that the tortious act was authorized. If the act itself was authorized, then the conduct would have been in the course and scope. We believe, therefore, that authorization as used in the statute applies to vicarious liability found outside course and scope of employment.

That liability is described in RESTATEMENT § 219(2) and may be imposed because of the authority or power the master has given a servant, especially one in a supervisorial position. Under common-law principles of agency a master is vicariously liable outside of course and scope of employment for torts committed by a servant when the servant purports to "act or speak on behalf of" the master and "was aided in accomplishing the tort by the existence of the agency relationship." RESTATEMENT § 219(2)(d).

Heinze spoke and acted for APAAC. It put him in a position to control and run its business, evidently investing him with power to run its office and control its employees. It did this arguably knowing or having reason to know of his aberrant propensities. It kept him in that position for nearly a decade, again arguably knowing the manner in which he conducted himself. From this record, it appears APAAC did not adopt either a formal policy against sexual harassment or a grievance procedure for employees. As a result, complaints about sexually harassing incidents presumably were to be resolved by Heinze, the perpetrator. Given these factors, we cannot say as a matter of law that the master has no vicarious liability for acts outside the scope of employment. The com-

ment to RESTATEMENT § 219 puts it in the following words:

> This Subsection enumerates the situations in which a master may be liable for torts of servants acting solely for their own purposes and hence not in the scope of employment.... Clause (d) includes primarily *situations in which the principal's* liability is based upon conduct which is within the apparent *authority* of a servant, as where one purports to speak for his employer in defaming another or interfering with another's business. Apparent authority may also be the basis of an action of deceit, *and even physical harm.* In other situations, the servant may be able to cause harm because of his position as agent, as where a telegraph operator sends false messages purporting to come from third persons. Again the manager of a store operated by him for an undisclosed principal is enabled to cheat the customers because of his position. The enumeration of such situations is not exhaustive, and is intended only to indicate the area within which a master may be subjected to liability for acts of his servants not in scope of employment.

RESTATEMENT § 219(2), cmt. e (citations omitted) (emphasis added). We believe RESTATEMENT § 219(2)(d) deals with a supervisor's authority and that employer liability in factual situations such as this is well recognized both in agency case law and in Title VII cases. *See, e.g., Faragher,* 111 F.3d at 1536; *see also* Oppenheimer, *supra,* 81 CORNELL L. REV. at 88–90 and nn. 110–113 (analyzing both common law and Title VII cases). Oppenheimer concludes that such "liability is properly viewed as vicarious, not direct, since it [may be] imposed without considering the fault of the employer." *Id.* at 88.

Many of the federal cases have found vicarious liability properly imposed under RESTATEMENT § 219(2)(d) under facts similar to those before us. *See, e.g., Harrison v. Eddy Potash, Inc.,* 112 F.3d 1437, 1445–46 (10th Cir.1997); *Karibian v. Columbia University,* 14 F.3d 773, 780 (2d Cir.1994).

Application of the authority concept to supervisorial sexual harassment cases has been described in the following manner:

> Moreover, under common law agency principles an employer is also liable for an employee's wrongful acts, even if those acts are *not* committed within the actual scope of his employment, *if* the employee uses his apparent authority to accomplish the wrongful acts and so is acting within the "apparent scope" of his employment.

*Martin,* 48 F.3d at 1352 (citations omitted) (emphasis in original).

Under the common law of agency a supervisor's use of the actual or apparent authority of his position—power conferred by the employer—"gives rise to [the employer's] liability under a theory of respondeat superior." *Nichols,* 42 F.3d at 514, citing RESTATEMENT § 219(2)(d) and cases; *see also Harrison,* 112 F.3d at 1450.

Heinze's sexually abusive acts were thus within his authorization if it is found that APAAC gave Heinze the power and authority with which to create and maintain a sexually abusive work environment or to establish a *quid pro quo* position over APAAC employees. We believe the record in this case, including the authority given Heinze, his methods of operating the office, APAAC's tolerance of those methods, and the lack or presence of sexual harassment policies or grievance procedures are factors that prohibit summary judgment in favor of the state on this issue also. *See Harrison,* 112 F.3d at 1444.

## CONCLUSION

The trial judge erred in granting summary judgment on the basis of collateral estoppel. That doctrine is inapplicable to this case, in which no judgment was entered against the party sought to be estopped. Accordingly, we vacate the trial court's judgment in favor of Schallock.

The court of appeals erred in directing judgment in favor of the state. The present record does not establish as a matter of law that Heinze's acts were not within the course and scope or authorization of his employment. Accordingly, we vacate the court of appeals' opinion.

Because this court did not accept review of all the issues raised on appeal, we remand the case to the court of appeals for further proceedings consistent with this opinion.

JONES, V.C.J., MOELLER and MARTONE, JJ., and JOSEPH M. LIVERMORE, Judge (Retired), concur.

THOMAS A. ZLAKET, C.J., did not participate in the determination of this matter; pursuant to article VI, § 3 of the Arizona Constitution, the Honorable JOSEPH M. LIVERMORE, Judge (Retired) of the Arizona Court of Appeals, Division Two, was appointed to sit in his stead.