876 P.2d 1166

Christine SMITH, an individual,
Plaintiff–Appellant,

v.

AMERICAN EXPRESS TRAVEL RE-
LATED SERVICES COMPANY,
INC., Defendant–Appellee.

No. 1 CA–CV 91–0572.

Court of Appeals of Arizona,
Division 1, Department C.

March 17, 1994.

Reconsideration Denied July 20, 1994.

Douglas G. Wymore and Tracey Wester-hausen, Phoenix, for plaintiff-appellant.

Steptoe & Johnson by Lawrence Allen Katz, Monica L. Goebel, Phoenix, for defendant-appellee.

OPINION

TOCI, Presiding Judge.

Appellant Christine Smith sued American Express Travel Related Services Company ("TRS") for sexual harassment based upon common law tort and contract principles. Smith appeals from the trial court's grant of summary judgment and award of attorneys' fees in favor of TRS.

We must decide under the standard adopted in *Orme School v. Reeves,* 166 Ariz. 301, 802 P.2d 1000 (1990), whether Smith presented evidence from which reasonable people could conclude either that: (1) Edwin Nally acted within the scope of his employment with TRS when he sexually harassed Smith, so that TRS is vicariously liable for Nally's conduct; or (2) because TRS knew or should have known of Nally's conduct and failed to prevent it, TRS is independently liable to Smith for intentional and negligent infliction of emotional distress and for breach of the employment contract covenant of good faith and fair dealing.

We hold that no reasonable person could conclude that Nally acted within the scope of his employment in sexually harassing and assaulting Smith. We also hold that Smith did not produce competent evidence either that TRS knew or should have known of Nally's conduct or that TRS failed to take action to prevent such conduct. Consequently, the principles set forth in *Ford v. Revlon, Inc.,* 153 Ariz. 38, 734 P.2d 580 (1987), are not applicable here. Because we affirm the trial court's judgment in favor of TRS on these grounds, we need not reach the issue of whether Arizona's workers' compensation statute provides Smith's exclusive remedy for any physical injuries and emotional distress she may have suffered. We affirm the judgment of the trial court except for the portion that awards attorneys' fees to TRS.

## I. FACTS AND PROCEDURAL HISTORY

Because this is an appeal from summary judgment, we view the facts in the light most favorable to the party against whom judgment was entered. *Wagenseller v. Scottsdale*

*Memorial Hosp.*, 147 Ariz. 370, 388, 710 P.2d 1025, 1043 (1985).

Smith, a twenty-two year employee of TRS, was employed in Phoenix as a fraud coordinator in the Fraud Operations Department from January 1984 until August 1990. Nally was also a twenty-year employee of TRS and was the manager of TRS Fraud Operations for the United States. He was not Smith's direct supervisor. From 1984, when Smith first met Nally, until December 1987, they had a friendly working relationship. During this time, Nally engaged in sexual joking with Smith and flirted with her. He occasionally patted her, touched her on the arms and shoulders, and put an arm around her waist. Until December 1987, Smith was not offended by Nally's conduct.

Beginning in December 1987, Nally began to engage in what Smith believed was sexual harassment. In addition to teasing her at her desk as part of a daily ritual, he harassed Smith in other ways. For example, he grabbed or touched Smith's breasts, rubbed up against her, touched her leg under her dress, threw a condom on her desk, and tossed candy down the front of her blouse, all in the view of other employees. On one occasion he grabbed her and started to carry her out of the building. On at least four occasions, he forced her to have sex with him at various locations in the TRS building. Smith submitted to Nally's sexual advances because she felt physically threatened by him. She also felt that to do otherwise might cause her to lose her job. Nevertheless, Nally did not promise Smith any reward if she submitted to his advances or threaten her with any adverse consequences if she refused.

During this time, TRS had a written policy prohibiting sexual harassment. Copies of the policy were posted throughout the TRS building, and TRS distributed a sexual harassment memorandum to its employees approximately once a year. Smith was familiar with TRS's sexual harassment policy and grievance procedures. Under this policy, employees could submit oral or written complaints, even anonymously, to TRS's Human Resources Department, and TRS would conduct a confidential investigation.

Between December 1987 and July 1989, Smith complained about Nally's conduct to several non-managerial co-workers, her sister-in-law Patricia Mereness, and her therapist. Although her co-workers and her therapist suggested that she report Nally to the TRS Human Resources Department, Smith declined, requesting that the matter be kept confidential. She specifically requested Mereness, a managerial employee of TRS in another facility, not to tell anyone outside the family about Nally's harassment.

Smith did not comply with the TRS procedure for reporting sexual harassment. Also, she did not report Nally's conduct to either of the two women who were her supervisors during the time she was being harassed. In either December 1988 or late spring or early summer of 1989, Smith asked Ken Robbins, a manager in the Fraud Operations group, to have lunch with her so that she could talk to him about a problem she was having with Nally. Smith told Robbins that Nally was sexually harassing her but did not give him any details about Nally's conduct. He told her to contact the personnel department and assumed that she followed his advice.

In July 1989, Alan Bickel, an occasional acting supervisor of the Fraud Department in Nally's absence, told a TRS employee during an exit interview that sexual harassment was occurring in the Fraud Department. When contacted by a TRS human relations specialist, Bickel said that he thought Nally was sexually harassing Smith. The human relations specialist met with Smith two days later, and Smith told her that Nally had sexually assaulted and harassed her.

TRS immediately began an investigation of Smith's allegations. Smith was instructed to call in sick, and on the next workday, TRS placed Nally on indefinite suspension. Two weeks later, after TRS gave Nally the option of resigning or being fired, Nally resigned. Smith then returned to her position in the Fraud Department, the sick leave she had used was reinstated, and TRS waived posting restrictions for Smith so that she could apply for other positions within TRS if she wished to transfer out of the Fraud Department.

After TRS terminated Nally, Smith continued to work for TRS for about one year. In August 1990, Smith resigned from TRS to accept a similar position with a bank.

On July 2, 1990, Smith filed a complaint against Nally and TRS. She asserted claims for assault and battery, intentional infliction of emotional distress, and negligent infliction of emotional distress against both Nally and TRS. Smith also alleged claims for relief against TRS for breach of contract and breach of the implied covenant of good faith and fair dealing.

The trial court granted TRS's motion for summary judgment. The court ruled that no disputed issues of material fact existed and that Nally's conduct was outside the scope of his employment. Thus, TRS could not be held vicariously liable for Smith's claims for assault and battery and intentional and negligent infliction of emotional distress against TRS. The court further found that Smith did not utilize the remedies offered to her by TRS and that TRS did not engage in any extreme or outrageous behavior like that found in *Ford v. Revlon.* Finally, the court ruled that Smith could not recover on her contract claims because she had alleged no contract damages and could not recover tort damages for breach of contract.

Following the denial of Smith's motion for reconsideration, the trial court entered judgment for TRS and summarily ordered Smith to pay TRS's attorneys' fees in the amount of $57,281.50 and costs of $4,383.65. Smith appealed from the judgment.

## II. DISCUSSION

### A. TRS's Alleged Liability Under *Respondeat Superior*

We conclude that the trial court correctly ruled that Nally's conduct in sexually assaulting and harassing Smith was outside the scope of his employment. Nally's sexual misbehavior and assaultive conduct was neither the kind of activity for which he was hired nor was it actuated, even in part, by a desire to serve TRS. Thus, we follow the majority of cases that have held that, under common law principles, an employee's sexual harassment of another employee is not within the scope of employment.

We first observe that this appeal involves common law tort and contract claims rather than sexual harassment claims brought under either Title VII of the Civil Rights Act of 1964, 42 U.S.C. sections 2000e to 2000e–17 (1988) or Arizona's Civil Rights Act, Ariz.Rev.Stat.Ann. ("A.R.S.") sections 41–1461 through 41–1465 (1992). Title VII liability is much broader than common law tort liability. *Spencer v. General Elec. Co.,* 894 F.2d 651, 657 (4th Cir.1990). One reason is that in Title VII actions, employer liability is based on a statutory scheme that broadly defines "employer," *id.,* to include "agents" of the employer, 42 U.S.C. section 2000e(b) (1988). In common law tort actions, however, the acts of the employer's agents generally do not subject the employer to liability unless the elements of the doctrine of *respondeat superior* are met. Consequently, here we look to this common law doctrine rather than to the federal and state antidiscrimination statutes and cases interpreting such statutes.

According to the doctrine of *respondeat superior,* "an employer is vicariously liable only for the behavior of an employee who was acting within the course and scope of his employment." *Pruitt v. Pavelin,* 141 Ariz. 195, 205, 685 P.2d 1347, 1357 (App. 1984); *Scottsdale Jaycees v. Superior Court of Maricopa County,* 17 Ariz.App. 571, 574, 499 P.2d 185, 188 (1972). In Arizona, "[t]he conduct of a servant is within the scope of employment if it is of the kind the employee is employed to perform, it occurs substantially within the authorized time and space limit, and it is actuated at least in part by a purpose to serve the master." *Love v. Liberty Mut. Ins. Co.,* 158 Ariz. 36, 38, 760 P.2d 1085, 1087 (App.1988); *Duncan v. State,* 157 Ariz. 56, 61, 754 P.2d 1160, 1165 (App.1988). As explained by the court in *Ray Korte Chevrolet v. Simmons,* 117 Ariz. 202, 207, 571 P.2d 699, 704 (App.1977):

Under Arizona law, an employee is acting within the scope of his employment while he is doing any reasonable thing which his employment expressly or impliedly authorizes him to do or which may reasonably

be said to have been contemplated by that employment as necessarily or probably incidental to the employment.

In other words, an employer is liable for the conduct of its employee if at the time the injury occurred "the employee was performing a service in furtherance of [the] employer's business." *Ohio Farmers Ins. Co. v. Norman*, 122 Ariz. 330, 332, 594 P.2d 1026, 1028 (App.1979).

Whether an employee's tort is within the scope of employment is generally a question of fact. *John R. v. Oakland Unified Sch. Dist.*, 48 Cal.3d 438, 256 Cal.Rptr. 766, 771, 769 P.2d 948, 953 (1989); *Birkner v. Salt Lake County*, 771 P.2d 1053, 1057 (Utah 1989). It is a question of law, however, if the undisputed facts indicate that the conduct was clearly outside the scope of employment. *John R.*, 769 P.2d at 953; *Birkner*, 771 P.2d at 1057; *see also Peters v. Pima Mercantile Co., Inc.*, 42 Ariz. 454, 462, 27 P.2d 143, 146 (1933) (employee's departure from employer's instructions was so complete that court was justified in holding as matter of law that he was not serving his employer).

Here, the trial court properly granted summary judgment, finding that Nally's conduct was outside the scope of his employment. Nally's actions were not expressly or impliedly authorized as part of his job duties. Nor could his conduct have been reasonably contemplated as being necessarily or probably incidental to his employment. Clearly, Nally did not perform a service in furtherance of TRS's business when he harassed and assaulted Smith. His alleged tortious actions were committed solely to further his own personal interests.

Our conclusion is supported by reported cases in other jurisdictions. Most courts that have considered the question have held that, as a matter of law, an employee's sexual harassment of another employee is not within the scope of employment. *See Dockter v. Rudolf Wolff Futures, Inc.*, 684 F.Supp. 532, 536 (N.D.Ill.1988), *aff'd*, 913 F.2d 456 (7th Cir.1990) (supervisor's sexual misbehavior committed entirely for his own enjoyment and benefit; he neither intended to nor did benefit his employer by his actions); *Valdez v. Church's Fried Chicken, Inc.*, 683 F.Supp. 596, 610 (W.D.Tex.1988) (employer not liable for team leader's sexual assault of employee at work because sexual assault was purely personal and had nothing to do with his job); *Favors v. Alco Mfg. Co.*, 186 Ga.App. 480, 367 S.E.2d 328, 331 (1988) (supervisor's sexual harassment of plaintiff not committed to further employer's business); *Carr v. U.S. West Direct Co.*, 98 Or.App. 30, 779 P.2d 154, 157 (1989), (no indication that supervisor acting for other than personal motives in sexually harassing employee or that the employment was even remotely the cause of his conduct); *but see Carlson v. Crater Lake Lumber Co.*, 105 Or.App. 314, 804 P.2d 511, 513 (1991) (genuine issue of material fact as to whether supervisor's actions towards plaintiff were sexual harassment and whether they took place within scope of employment).

Smith claims, however, that the real issue is whether Nally's conduct was foreseeable as within the range of responsibilities TRS entrusted to him. She cites *Johnson v. Weinberg*, 434 A.2d 404, 408 (D.C.App.1981), and *Howard University v. Best*, 484 A.2d 958, 987 (D.C.App.1984), in support of this position. She argues that because TRS put Nally in a supervisory position where he could assault and harass women he supervised and because he was responsible for administering sexual harassment policies within the department, TRS is liable for his conduct. We disagree.

*Johnson* involved the shooting of a laundromat customer by an employee. When the customer returned to the washing machine in which he was laundering his shirts, he found them missing. After the customer questioned the employee periodically over a period of several hours about the missing laundry, the employee shot him. The trial court directed a verdict in favor of the laundromat owner, holding that the employee's action was outside the scope of his employment. On appeal, the District of Columbia Court of Appeals reversed, concluding that sufficient evidence existed from which a reasonable person could find that the shooting was "the outgrowth of a job related controversy." *Id.* at 408–09.

Because we are not convinced that *Johnson* was properly decided, we decline to fol-

low it. *See* Restatement (Second) of Agency § 245 cmt. f (1958) ("The fact that the servant acts in an outrageous manner or inflicts a punishment out of all proportion to the necessities of his master's business is evidence indicating that the servant has departed from the scope of employment in performing the act."). Additionally, we note that the District of Columbia Court of Appeals has since remarked that *Johnson* "approaches the outer limits of liability that may be imposed under *respondeat superior.*" *Boykin v. District of Columbia*, 484 A.2d 560, 563 (D.C.App.1984).

Neither does *Howard University v. Best* persuade us that a jury question exists whether Nally's conduct fell within the scope of his employment. Although in *Best*, the trial court's directed verdict against a faculty professor for sexual harassment was reversed on appeal, we conclude that *Best* is dubious authority. First, although *Best* states that many of the incidents of sexual harassment occurred during faculty meetings attended by the plaintiff and her supervisor in their professional capacities, the District of Columbia Court of Appeals never tells us how such harassment was related to the supervisor's employment. Second, in announcing the broad rule that Smith asks us to apply in this case, the *Best* court relied upon *Johnson*, a case we decline to follow, and *Penn Central Transportation Co. v. Reddick*, 398 A.2d 27 (D.C.App.1979), a case that actually supports a contrary rule.

In *Penn Central*, the District of Columbia Court of Appeals reversed the judgment of the district court in favor of the plaintiff. The appellate court held that an altercation between the railroad's employee and a taxi driver "was neither a direct outgrowth of the employee's instructions or job assignment, nor an integral part of the employer's business activity, interests or objectives." *Penn Cent.*, 398 A.2d at 32. That court thus concluded that a jury could not reasonably find that the supervisor's actions arose out of and in the course of his employment. *Id.* Consequently, *Penn Central* provides no underpinning for the broad proposition for which it is cited in *Best*, that "[l]iability may be extended to situations 'where the employment provides a "peculiar opportunity and ... incentive for" ' the tortious activity." 484 A.2d at 987 (quoting *Penn Cent.*, 398 A.2d at 31 (citations omitted)).

### 1. Ratification

We conclude that no evidence exists from which a reasonable juror could conclude that TRS knew about Nally's sexual misconduct and ratified it. Smith did not report the harassment or assaults to her own immediate supervisors, to Nally's supervisor, or to the TRS Human Resources Department. In fact, she attempted to keep TRS management from learning of Nally's conduct by telling those with whom she had discussed the matter to keep the information a secret. Finally, no evidence exists in this record from which a reasonable juror could conclude that TRS knew or should have known that Nally had created a sexually offensive working environment and thus was capable of sexual assault.

We first turn to the principles governing ratification. An employer is not liable for the acts of an employee under a ratification theory unless the employee acted on behalf of or under the authority of the employer and clear evidence exists of the employer's approval of the wrongful conduct. *Sharples v. Hawaii*, 71 Haw. 404, 793 P.2d 175, 177 (1990).

Smith argues that TRS had actual knowledge of Nally's sexual misconduct because of Smith's complaints to her sister-in-law, Mereness. We reject this argument. The complaints made by Smith to Mereness did not reach the proper TRS personnel because Smith instructed her not to discuss the matter outside the family. Smith conceded at her deposition that she knew Mereness would honor this request, and no evidence exists in this record that Mereness ever notified TRS of Nally's harassment.

In an effort to establish TRS's knowledge of Nally's conduct, Smith asserts that Bickel was aware of the sexual harassment when he was functioning as an "acting supervisor" in the Fraud Department. This argument has no merit. First, "a corporation is bound by the knowledge acquired by, or notice given to, its agents or officers

*which is within the scope of their authority and which is in reference to a matter to which their authority extends." Fridena v. Evans,* 127 Ariz. 516, 519, 622 P.2d 463, 466 (1980) (emphasis added). No evidence exists in the record that Bickel acquired any knowledge of Nally's sexual misconduct while acting within the scope of his authority as an occasional supervisor. Second, although Bickel did act as Nally's temporary replacement approximately four times between February 1988 and December 1988, this naturally occurred when Nally was absent from work. On these occasions, since Nally was not on the job, Bickel could not, as temporary acting supervisor, have observed any misconduct by Nally.

▪ Finally, the evidence is undisputed that during the time Bickel substituted for Nally, no person, including Smith, complained to Bickel about Nally's sexual harassment of Smith. Consequently, Bickel's knowledge of Nally's conduct was necessarily obtained when he was not acting as a supervisor. Such knowledge is not imputed to TRS. *See Fridena,* 127 Ariz. at 519, 622 P.2d at 466 (corporation only bound by knowledge acquired by agents or officers in the scope of their authority and in reference to a matter to which their authority extends).

▪ Similarly, although Robbins was a management employee of TRS, the record is devoid of any evidence that he had the authority to deal with sexual harassment claims. The undisputed evidence establishes that sexual harassment complaints were to be processed through the TRS Human Resources Department. Thus, the knowledge of sexual harassment acquired by Robbins at a lunch with Smith was not acquired in the scope of Robbins' authority or in reference to a matter to which his authority extended. *See id.* Furthermore, Smith does not dispute that Robbins told her that she should report Nally's conduct to the Human Resources Department, and he thought she had done so. Thus, no basis exists to impute Robbins' knowledge of Nally's conduct to TRS.

▪ Finally, Smith contends that knowledge of Nally's sexual assaults should be imputed to TRS because Nally held an "upper management level position" in the company. We reject this argument. First, as we discuss above, because this is not a Title VII action, Nally's knowledge of the sexual harassment is not imputed as a matter of law to his employer. Second, an agent's tortious conduct is imputed to the principal only if the agent acquired the information in the scope and course of his employment with the principal. *Id.* Nally's duties did not include sexual assault or harassment. Thus, his knowledge of these activities cannot be imputed to TRS.

▪ Smith appears to argue that TRS should be held liable for Nally's sexual assaults because it knew or should have known that he had created a sexually offensive work environment and thus was capable of sexual assault. We disagree. Smith presented no evidence from which a reasonable juror could find that TRS knew that Nally had created a sexually offensive work environment. Smith did not complain about Nally to any corporate employee with authority over Nally or any management employee who was responsible for dealing with such matters. *See Fridena,* 127 Ariz. at 519, 622 P.2d at 466. Furthermore, Smith was unable to come forward with any evidence that any prior sexual harassment claim had ever been brought against Nally or that he had any prior history of assault. In absence of such evidence, a reasonable juror could not conclude that TRS could reasonably have foreseen that Nally would assault Smith.

## B. TRS's Own Actions

▪ Smith argues that the trial court erred in finding that it was undisputed that TRS did not engage in extreme or outrageous behavior that would constitute intentional tortious conduct. Smith asserts that TRS acquired notice of the sexual assaults and harassment through Smith's complaints to company managers, and then failed to act promptly to investigate and take action against Nally. She likens her situation to that in *Ford v. Revlon,* in which the Revlon Company was liable for its own failure to take action against a management employee who harassed Ford. We disagree.

Smith's situation does not remotely resemble the facts in *Ford*. There, for nearly a year, Ford reported to Revlon officials that her supervisor was sexually harassing her. She also complained about the situation to numerous Revlon employees. In addition, she told the comptroller in Phoenix, the personnel manager for the clerical and technical group in the Phoenix plant, the personnel manager for executives, the director of personnel at the Phoenix plant, a manager in receiving, a manager of human resources at the company headquarters in New Jersey, and a corporate Equal Employment Opportunity specialist. It was a year and a month after the supervisor's first act of harassment before Revlon censured the supervisor. *Ford*, 153 Ariz. at 40–41, 734 P.2d at 582–83. In the words of the *Ford* court:

> Ford made numerous Revlon managers aware of Braun's activities at company functions. Ford did everything that could be done, both within the announced policies of Revlon and without, to bring this matter to Revlon's attention. Revlon ignored her and the situation she faced, dragging the matter out for months and leaving Ford without redress.

*Id.* at 43, 734 P.2d at 585. The Arizona Supreme Court held that Revlon's failure to promptly take appropriate action in response to Ford's complaint of sexual harassment constituted the tort of intentional infliction of emotional distress. *Id.* at 44, 734 P.2d at 586.

Here, as we discuss above, Smith has produced no evidence that anyone at TRS with the authority to remedy her problem with Nally had notice of Nally's conduct. Smith conceded that she knew of the company's procedures for reporting sexual harassment, and the evidence shows that a number of her co-workers and her therapist urged her to report Nally's conduct. Not only did she not use those procedures, she attempted to prevent anyone with knowledge of the situation from reporting it to TRS representatives who could have dealt with the problem. The record, therefore, contains no basis on which a reasonable person could find that TRS learned of and ignored the situation Smith faced.

Smith argues, however, that she should not be denied recovery based on her failure to avail herself of the reporting procedures offered by TRS. She contends that she was afraid of Nally. According to Smith, other employees' experiences had shown that it was futile to complain to personnel or Nally's supervisor about problems with Nally. As support for this argument, she cites *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), in which the United States Supreme Court rejected the argument that an employer could not be held liable if the employee had failed to file a formal complaint regarding sexual harassment.

*Vinson* is distinguishable from Smith's case for several reasons, not the least of which is the fact that it is based on Title VII, rather than common law tort principles. In any event, in *Vinson*, 477 U.S. at 72–73, 106 S.Ct. at 2498–2499, the Court noted that Meritor's general nondiscrimination policy did not address sexual harassment in particular. Furthermore, its grievance procedure required an employee to complain first to her supervisor, which in *Vinson* was the alleged offender. *Id.* Thus, the *Vinson* Court did not find it surprising that Vinson did not report her grievance to her supervisor. *Id.* Here, however, TRS's policy specifically dealt with sexual harassment and the procedure provided for reporting such harassment to employees *other than Nally*. Consequently, it was not error for the trial court to deny Smith's claim for intentional infliction of emotional distress on grounds that Smith failed to make use of the remedies offered by TRS.

■ Finally, Smith argues that she did not report Nally because other employees had found that complaints against Nally were not satisfactorily resolved. For several reasons, this argument is not persuasive. First, Smith does not dispute that as soon as the Human Resources Department learned of the complaint, TRS acted swiftly and decisively, ultimately terminating Nally within two weeks after the complaint. Second, it is not enough to merely allege that filing a grievance would be futile; the employee must attempt the use of such procedures before claiming futility. *Dearden v. Liberty*

*Medical Ctr., Inc.,* 75 Md.App. 528, 542 A.2d 383, 386–87 (Md.Ct.Spec.App.1988). Third, although Smith produced evidence that other employees felt that way, she did not establish that she knew about their experiences when she made her decision not to report Nally, and the record is undisputed that none of TRS's employees had ever reported Nally for sexual harassment.

### C. Judgment on Contract Claims

■ The trial court granted judgment in favor of TRS on Smith's claims for breach of contract and breach of the implied covenant of good faith and fair dealing. In reaching this conclusion, the court stated that Smith's recovery under those claims was barred because she had not alleged any contract damages and could not recover tort damages for breach of contract. Smith argues on appeal that a tort remedy should be allowed for breach of an employment contract. We reject Smith's argument. In *Wagenseller,* 147 Ariz. at 385, 710 P.2d at 1040, the Arizona Supreme Court declined to extend tort recovery for breach of the implied covenant of good faith and fair dealing beyond insurance contracts. The *Wagenseller* court noted that although this implied covenant protected the rights of the parties to an employment agreement to receive the benefits of the agreement, the recovery was limited to the right to receive the benefits that were a part of her employment agreement. *Id.*

More recently, in *Woerth v. City of Flagstaff,* 167 Ariz. 412, 417–18 n. 7, 808 P.2d 297, 302–03 n. 7 (App.1990), citing *Wagenseller,* this court observed that Arizona has consistently refused to recognize a tort action for breach of the implied covenant of good faith and fair dealing in the employment contract context. Accordingly, Smith could not have recovered tort damages for her contract claims. Because she did not allege any contract damages, the trial court did not err in granting TRS judgment on Smith's contract claims.

### D. Workers' Compensation as Exclusive Remedy

In its disposition of this case below, the trial court did not address TRS's argument that Arizona's workers' compensation statute provides Smith's exclusive remedy for any physical injuries and emotional distress she may have suffered. Because we affirm the trial court's judgment in favor of TRS on the grounds discussed above, we need not reach this issue.

### E. Attorneys' Fees Award in Favor of TRS

The trial court awarded $57,281.50 in attorneys' fees in favor of TRS against Smith. Smith argues that the court improperly awarded fees because, despite Smith's request for a hearing on TRS's fee application, the court did not hold a hearing. Smith also contends the trial court apparently failed to weigh the factors set forth in *Associated Indemnity Corp. v. Warner,* 143 Ariz. 567, 694 P.2d 1181 (1985), in making its decision to award fees. Finally, Smith argues that because her action was a mixed tort and contract action, attorneys' fees should have been awarded only for defenses of claims that arose out of contract.

■ We agree with Smith that the court should have held a hearing on the fee application. In her response to TRS's application for an award of fees, in which she objected to the application, Smith requested oral argument. Rule 3.7(e)(3), Maricopa County Local Rules of the Superior Court, provides that if the claim for fees is contested, "a hearing shall be granted if requested by any party." TRS argues that Smith was not entitled to a hearing because she did not follow the procedures for obtaining an oral argument set forth in Rule 3.2(d)(1),[1] Maricopa County Lo-

---

1. Rule 3.2(d)(1), Maricopa County Local Rules of the Superior Court states:

   (1) *Oral Argument:* Any party ·desiring oral argument shall secure a time of hearing from the judge assigned to the case and shall file with the motion or response a separate notice of hearing setting forth the date, time, judge and location for the hearing. The date of the hearing shall be such as to give each party sufficient time to comply with this Rule and Rule IV of the Uniform Rules of Practice, and to allow the Court at least five (5) additional days prior to such hearing unless otherwise directed by the Court.

cal Rules of the Superior Court. Rule 3.7, however, does not appear to require a party requesting a hearing on a claim for a fee award to comply with Rule 3.2; in fact, Rule 3.7(e)(2) provides that "[t]he time for ... the hearing on the claim shall be set by the court." Therefore, the trial court should have conducted a hearing on the application for fees. We thus vacate the award of fees in favor of TRS and remand for a hearing on the application.

 Upon remand and hearing on the application, the trial court should apply the factors set forth in *Associated Indemnity* to determine whether an award of attorneys' fees is warranted. In addition, we agree with Smith that fees should be awarded only for TRS's defense of claims that arose out of contract. *See Western Technologies, Inc. v. Sverdrup & Parcel, Inc.*, 154 Ariz. 1, 7–8, 739 P.2d 1318, 1324–25 (App.1986).

TRS argues that because all of Smith's tort claims were intertwined with and based on her contract claims, the trial court correctly awarded it attorneys' fees pursuant to A.R.S. section 12–341.01 (1992). We do not agree. A.R.S. section 12–341.01(A) states, in part, "[i]n any contested action *arising out of a contract, express or implied,* the court may award the successful party reasonable attorney's fees." (Emphasis added.) Here, Smith's claims for assault and battery and negligent and intentional infliction of emotional distress against TRS were based on vicarious liability through the doctrine of *respondeat superior.* These claims are not intertwined with or based on Smith's alleged breach of contract claims; rather, these are solely tort claims. *See Ford*, 153 Ariz. at 45, 734 P.2d at 587 (award of attorneys' fees pursuant to A.R.S. § 12–341.01 improper if the cause of action in tort could exist but for the alleged breach of contract). Consequently, the trial court erred in awarding TRS attorneys' fees for defending against these claims. TRS is, however, entitled to an award of attorneys' fees for defending against Smith's breach of contract and breach of the implied covenant of good faith and fair dealing claims. Both of these claims arose out of contract, thus an award under A.R.S. section 12–341.01 is proper. Accordingly, we vacate the award of attorneys' fees to TRS and remand to the trial court for a proper determination of that issue.

### III. CONCLUSION

In summary, we affirm the trial court's grant of summary judgment in favor of TRS. We, however, vacate the portion of the judgment awarding attorneys' fees in favor of TRS and remand for a hearing on TRS's application for an award of fees. TRS has requested an award of fees on appeal. In our discretion, we deny the request.

NOYES and EHRLICH, JJ., concur.