5 P.2d 249

L. Kenneth BAKER, on Behalf of HALL BRAKE SUPPLY, INC., Employee Profit Sharing Plan; Richard Bertocchi as Trustee of Regal Lighting Fixture Co., Inc. Profit Sharing Plan; Susan W. Boyes and William J. Boyes, wife and husband; Profit Sharing Plan of Carmen H. Brooks, M.D., P.C.; James E. Campbell a Trustee of James E. Campbell, M.D., P.C. Profit Sharing Plan and Trust; A. Leroy Ellison as Trustee of the Allen Leroy Ellison Family Trust; W. Lee Fanning M.D., Ltd., Pension Plan; Murray E. Goodman, as Trustee of Goodmans Inc. Defined Benefit Pension Plan; Harry W. Hale, Jr., M.D. as Trustee of the Hale Family Trust; Richard L. Henderson and Barbara A. Henderson, husband and wife; Lawrence Koep as Trustee of the Erik Kenneth Koep Trust; Robert E. Leber, M.D. as Trustee of the Robert E. Leber, M.D., P.C. Profit Sharing Plan; W. Steven Leeper, M.D. as Trustee of the W. Steven Leeper, M.D., P.C. Profit Sharing Plan; Alan H. Manas, M.D. as Trustee of the Sun City Eye Consultants, Ltd. Employee DBPP; Vicente G. Mortel, M.D. as Trustee of the Vicente Mortel, M.D., Ltd. Profit Sharing Plan; Guarantee and Trust Company, as Trustee for the Benefit of Walter J. Nieri, M.D., IRA Rollover, and Geraldine McGartland, former spouse of Walter J. Nieri, M.D.; NMM Limited Partnership; Richard T. Perry, M.D. as Trustee of Richard T. Perry, M.D., P.C., FACS; Dr. Charles M. Rucker as Trustee of the Arizona Heart and Lung Surgeons, Ltd. Retirement Plan; Alfred D. Sachs and Frances T. Sachs as Trustees of the Sachs Family Trust; Howard M. Segal; Southwest Medical Specialist, P.C. Amended and Restated Employee Pension Plan and Trust, including one-half interest currently held by Jerome G. Bickel, Smith Barney Shearson, IRA R/O Custodian; Robert H. Tamis, M.D. as Trustee of Robert H. Tamis, M.D., P.C. Employee Pension Plan; Ian A.D. Todd; David R. Towar as President and Trustee of Phoenix Dog & Cat Hospital Pension Plan; Ben A. Vanderwerf, M.D. as Trustee for Phoenix Transplant and Vascular Surgery Employee's Pension Plan; Fred Yerger, M.D., Paul Wasserman, M.D., W. Lee Fanning, M.D. and Steven Dippe, M.D., Officers of the Scottsdale Medical Specialists Ltd. Defined Benefit Pension Plan; Arizona Chest Physicians Employees' Pension Plan; ArMA Membership Benefits, Inc., IRA Custodian FBO William E. Dozer, M.D., IRA Rollover; L. Kenneth Baker, on Behalf of Hall Brake Supply Inc. Employee Profit Sharing Plan; Richard Besserman, Smith Barney Shearson, IRA R/O Custodial (Richard and Rosalie Besserman); Dale Block and Marshall B. Block; H.H. Buchman, II, M.D.; James H. Carlisle, M.D. as Trustee of James H. Carlisle, M.D., F.A.C.S., P.C. Employees' Pension Plan; Mark R. Cohen, M.D. as President of Mark R. Cohen, M.D., P.C.; David J. Crosby, M.D. and Eleanor Crosby as Trustees of D & E Investment Co.; Beverly E. Flentje; Estate of Dorothy A. Fox; Randall J. Fox; Ronald S. Garlikov, M.D. and Reda S. Garlikov, husband and wife; Ronald S. Garlikov, M.D. as Trustee of Southwest Eye Surgeons Profit Sharing Plan and Trust; David Goldfarb, M.D. as Trustee of David Goldfarb, M.D., P.C. Profit Sharing Plan; David Goldfarb, M.D. and Joan Goldfarb, husband and wife; Albert Hahn and James Cooley as Trustees of Cohaco Building Specialists, Inc. Money Purchase Pension Plan and Trust; Douglas Hilton; Robert E. Leber, M.D. as Trustee of the Robert E. Leber, M.D., P.C. Profit Sharing Plan; Lewis Equipment Profit Sharing Plan & Retirement Trust; Robert S. Lewis, M.D. as President of Ophthalmic Surgeons & Physicians Ltd. Pension Plan; John MacLeod Diversified, Inc. Employees Pension Plan; Stanley J. Marks; Max Minuck, M.D., individually, and as Trustee and Representative of the Estate of Estelle Minuck; John A. Pifer; William J. Salomon and Saundra E. Salomon, husband and wife; Howard M. Segal (aka Howard Segel); Jane Siegel; Allan B. Starr; Peter Thomas, M.D. as

536

Trustee of Thomas Laser Centers Medical Group Ltd. Profit Sharing Plan; Ben A. Vanderwerf, M.D. as Trustee for Phoenix Transplant and Vascular Surgery Employee's Pension Plan; Quail Run Airpark Limited Partnership; Ox Bow Airpark Limited Partnership; Chaparral Airpark Limited Partnership; Kachina Airpark Limited Partnership; North Black Canyon Properties I Limited Partnership; Cactus View Properties Limited Partnership; Palo Verde Valley II Limited Partnership; Pinnacle Peak Properties Limited Partnership, Plaintiffs–Appellants,

v.

STEWART TITLE & TRUST OF PHOENIX, INC., Defendant–Appellee.

No. 1 CA–CV 99–0211.

Court of Appeals of Arizona, Division 1, Department E.

May 2, 2000.

**538**

Bonnett, Fairbourn, Friedman & Balint, PC by Andrew S. Friedman and Wendy J. Harrison, Phoenix, Attorneys for Plaintiffs–Appellants.

Howard & Rouse, PC by Gary F. Howard, Phoenix, Attorneys for Defendant–Appellee.

## OPINION

GERBER, Judge.

¶ 1 In September, 1994, about 80 investors filed a complaint against multiple defendants alleging negligence, breach of fiduciary duty, common law fraud, securities fraud, consumer fraud, constructive fraud and violation of RICO statutes. The plaintiffs ("plaintiffs" or "appellants") obtained a judgment of $8,638,044 against Ben Friedman ("Friedman"), the main organizer and promoter of the scheme. Other defendants included his accountants, real estate broker and title company. This appeal involves the sole remaining defendant, Stewart Title and Trust of Phoenix, Inc. ("Stewart Title"). The main issue is whether Stewart Title is liable under *respondeat superior* for the conduct of its escrow agent, Bonnie DeAngio ("DeAngio").

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 Attorney Friedman solicited the plaintiffs to invest in a number of limited partnerships. With the participation of a real estate broker, accountants and title companies, he defrauded them by purchasing land under a fake name and then reselling it to the limited partnership at an inflated price.

**The Scheme**

¶ 3 Upon locating an appropriate property, Friedman, using a fictitious name or shell partnership, would buy the land through an escrow established at a title company. While the escrow was open, he would create a partnership and solicit investors to provide funds to pay the down payment. After the escrow closed and title was transferred to the fictitious buyer or shell entity, he would then "sell" the property to the limited partnership for a price greater than the purchase price he paid to the original seller. By acting through the fictitious buyers and shell entities, he was able to conceal the fact that

he was transferring the property to the investment partnership at a substantial profit. Friedman and his associates shared the undisclosed profit and related fees.

## DeAngio's Role

¶ 4 DeAngio, an employee of Stewart Title, processed at least eight escrows that Friedman established in the name of the fictitious buyers or shell entities. On at least one escrow transaction, she notarized the signature of a fictitious person on the deed of trust and assignment of rents executed in favor of the seller. On another escrow, not covered by this appeal, she assisted Friedman in impersonating a fictitious buyer in a face to face meeting with the original seller. Her participation in both transactions facilitated Friedman's scheme to conceal profits.

¶ 5 After the escrows were closed and title transferred to the fictitious buyer, Friedman, secretly acting as the fictitious buyer, transferred the property to the investment partnerships. Although these transactions were not handled in escrow, DeAngio notarized affidavits of value and some of the partnership documents. The affidavits of value showed that the fictitious buyer, whom DeAngio knew to be Friedman, was receiving the undisclosed profit on the transaction. Usually, after each closing, Tom Lynch, an associate of Friedman, would pay DeAngio several hundred dollars. No evidence exists that Stewart Title knew of DeAngio's wrongful actions.

¶ 6 DeAngio eventually terminated her employment with Stewart Title to work for Chicago Title, where she continued to participate in Friedman's schemes. Here and in the trial court, plaintiffs allege that she and Stewart Title are liable for the fraud-based claims because of her involvement with Friedman while she was working at Stewart Title.

## First Summary Judgment: The Winters Plaintiffs

¶ 7 Stewart Title first filed a motion to dismiss/motion for summary judgment which was denied by Judge Dunevant, who concluded that Stewart Title could be liable under *respondeat superior* for Racketeer Influenced and Corrupt Organizations Act ("RICO") violations. After the case was reassigned to Judge Howe, Stewart Title filed three more motions for summary judgment.

¶ 8 Stewart Title's first summary judgment motion related to plaintiffs who invested in property around Deer Valley Airport (Chaparral, Quail Run, Ox Box, and Kachina Airpark Limited Partnerships). Friedman purchased the property in the names of Robert and Estelle Winters ("Winters"). The Winters, names of real people known by Friedman, were uninvolved in these transactions. They never gave permission for use of their name or knew that their names were used.

¶ 9 DeAngio opened two escrows and prepared the escrow documents at Stewart Title. She notarized the fictitious Winters signatures on the deeds of trust on March 14, 1983, after leaving Stewart Title on March 5. Her last paycheck from Stewart Title was dated March 15. Friedman eventually sold the property to Quail Run, Ox Box and Kachina Airpark Limited Partnerships while DeAngio was at Chicago Title. She opened another escrow using the Winters' name while at Chicago Title. Friedman resold the property to Chaparral Airpark Limited Partnership ("Chaparral") through a Chicago Title escrow. DeAngio again notarized the fictitious signatures on the deeds of trust, assignment of rent, warranty deed and certificates of partnership.

¶ 10 Plaintiffs argued that DeAngio was involved with three of the four disputed Winters' escrows (Quail Run, Ox Box and Kachina) while at Stewart Title. They also asserted Stewart Title's liability for all the fraud-based claims, including those related to Chaparral, based on common law conspiracy. Judge Howe granted Stewart Title's motion for summary judgment on these issues.

## The Second Summary Judgment: The Baird Plaintiffs

¶ 11 In its second motion for summary judgment before Judge Howe, Stewart Title argued that it could not be liable for transactions related to plaintiffs Max and Rita Baird ("Baird plaintiffs") because neither it nor its employee DeAngio directly participated.

Friedman notarized the signatures on that transaction and First American Title closed the transaction. The Baird plaintiffs conceded they did not have a claim of negligence against Stewart Title but argued its liability under common law conspiracy. The trial court granted summary judgment in favor of Stewart Title on these issues.

### Third Summary Judgment: Northwest Phoenix and Central Arizona Properties Plaintiffs

¶ 12 Stewart Title filed another motion for summary judgment against plaintiffs who purchased property from Northwest Phoenix Properties ("NPP") and Central Arizona Properties ("CAP"), for which Friedman acted as general partner. Stewart Title argued that the plaintiffs were not misled or victimized because the fraud could have been discovered by reviewing the public record. In its view, Friedman did not hide his involvement with NPP or CAP; if the plaintiff buyers wanted to know about Friedman's role as general partner, such information was readily available.

¶ 13 Plaintiffs responded that they would not have discovered the fraud through such a search and, even if they could, access to public records would not bar their recovery. Judge Howe granted Stewart Title's third motion for summary judgment on these issues and awarded Stewart Title attorneys' fees.

¶ 14 Plaintiffs timely appealed all these rulings.

### STANDARD OF REVIEW

¶ 15 In reviewing a summary judgment, we view the facts in the light most favorable to the party opposing summary judgment. *See Hartford Accident & Indem. Co. v. Federal Ins. Co.*, 172 Ariz. 104, 107, 834 P.2d 827, 830 (1992). Summary judgment should be granted if the facts produced in support of the claim "have so little probative value ... that

reasonable people could not agree with the conclusion advanced." *Orme School v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). The determination whether summary judgment was proper is *de novo*. *See McDaniel v. Troy Design Services Co.*, 186 Ariz. 552, 554, 925 P.2d 693, 695 (1996).

### DISCUSSION

#### Doctrine of *respondeat superior*

¶ 16 Appellants now assert Stewart Title's liability for all claims under *respondeat superior*. Stewart Title disagrees and argues that it is not vicariously liable to any of the three groups of plaintiffs, the losing parties in the three summary judgments. We address this issue because it applies to each group of plaintiffs and to each summary judgment.

¶ 17 An employer is vicariously liable for the negligent or tortious acts of its employee acting within the scope and course of employment. *See Wiper v. Downtown Development Corp.*, 152 Ariz. 309, 310, 732 P.2d 200, 201 (1987); *see also Robarge v. Bechtel Power Corp.*, 131 Ariz. 280, 283, 640 P.2d 211, 214 (1982). Conduct falls within the scope if it is the kind the employee is employed to perform, it occurs within the authorized time and space limits, and furthers the employer's business even if the employer has expressly forbidden it. *See Smith v. American Express Travel Services*, 179 Ariz. 131, 135–36, 876 P.2d 1166, 1170–71 (1994); *Ohio Farmers Ins. Co. v. Norman*, 122 Ariz. 330, 331–32, 594 P.2d 1026, 1027–28 (1979).

¶ 18 Here, DeAngio's actions fell within the scope of her employment because she typically notarized documents and opened and closed escrows. Opening escrows using fictitious names by itself is legal; DeAngio's opening of these escrows was thus not wrongful unless she knew that Friedman was acting with intent to defraud.[1]

---

1. She also had assisted him in pretending to be someone else for a transaction not covered in this appeal. Such actions had occurred before the transactions at issue and, therefore, create an inference that she knew that Friedman's actions, including his otherwise legal opening of escrow

accounts under fictitious names, showed fraudulent intent. We must make this inference because we view the facts in the light most favorable to the party opposing summary judgment. *See Hartford Accident & Indem. Co.*, 172 Ariz. at 107, 834 P.2d at 830.

¶ 19 DeAngio's more apparent wrongful actions involved notarizing documents for Friedman that she knew he had signed under fictitious names and then concealing his fraudulent signature. *See Transamerica Ins. Co. v. Valley Nat'l Bank*, 11 Ariz.App. 121, 123, 462 P.2d 814, 816 (1969). Tom Lynch gave her cash after these closings. When Friedman was asked in his deposition, "So basically, anything that you asked her to do with respect to the defrauding of the investors, she [DeAngio] did?" he answered "yes." He also described her as "a very important facilitator" in his schemes. Though Stewart Title argues that appellants cannot show that DeAngio knew of Friedman's actions, the parties' depositions suggest that she may well have knowingly engaged in misconduct while at Stewart Title by notarizing signatures she knew to be false.

¶ 20 Stewart Title further claims that it would have received escrow fees, collection account fees and title insurance fees even if DeAngio had acted legitimately and, further, that the increase in purchase prices of properties due to her malfeasance did not affect its fees. Nevertheless, DeAngio's activity benefitted and furthered the business of Stewart Title because of the repeat business that she generated with Friedman. In fact, DeAngio stated that Stewart Title encouraged its escrow officers to procure new clients and develop business with existing clients. These clients would usually follow the escrow officers when they changed employment. Generating such benefits may suffice for liability. *See Transamerica Ins. Co.*, 11 Ariz.App. at 125, 462 P.2d at 818 (providing notary service could improve customer relations and further the company's purpose). Due to DeAngio's conduct furthering its business, Stewart Title may incur vicarious liability. *See Wiper*, 152 Ariz. at 310, 732 P.2d at 201. Whether Stewart Title would have received the same fees if she had acted properly is irrelevant.

¶ 21 Appellants contend that because DeAngio's last paycheck from Stewart Title was dated March 15, 1983, she therefore continued the work of Stewart Title in notarizing the Winters' signatures for the Quail Run, Ox Box and Kachina partnerships (the subject of the first summary judgment) on March 14, 1983. Stewart Title responds that DeAngio began work at Chicago Title on March 7, 1983 and no evidence shows that she continued any work for Stewart Title after that date. However, given fact questions about whether DeAngio knew that Friedman opened the two escrows with Stewart Title with the intent to defraud the Winters' plaintiffs, Stewart Title may still incur liability despite DeAngio's new job at Chicago Title. The trial court should not have granted the first summary judgment against the Winters' plaintiffs.

¶ 22 For similar reasons, Stewart Title may be liable to the CAP and NPP plaintiffs, subjects of the third summary judgment, because DeAngio notarized their documents while she was employed at Stewart Title. The plaintiffs had a right to rely on DeAngio's notarization. As escrow agent, DeAngio had a duty to disclose known fraud. *See Manley v. Ticor Title Ins. Co.*, 165 Ariz. 318, 322, 798 P.2d 1327, 1331 (1989).

¶ 23 Although Stewart Title argues that the plaintiffs could have learned of Friedman's role as general partner by a search of public records, plaintiffs were not obligated to do such a record search. The existence of public records is no defense to fraud. *See Field v. Mans*, 516 U.S. 59, 70, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (fraud exists even if the truth could be learned from public records); *Bishop Creek Lodge v. Scira*, 46 Cal.App.4th 1721, 54 Cal.Rptr.2d 745, 752 (1996) (constructive notice of the facts from public records is no defense to fraud).

¶ 24 Given these legal and factual questions, we reverse and remand the first and third summary judgments (excepting the Chaparral issue) to the trial court to determine, by trial or otherwise, if DeAngio is liable to the Winters and NPP and CAP plaintiffs respectively. If these plaintiffs can demonstrate that DeAngio acted improperly in their transactions and that her wrongdoing fell within the scope of her employment, Stewart Title may incur liability under the fraud and negligence claims relating to their transactions.

542

¶ 25 Although the Chaparral transaction is addressed in the first summary judgment against the Winters plaintiffs, Stewart Title is not liable for DeAngio's actions concerning that transaction because it occurred entirely at Chicago Title. No evidence suggests that her work at Chicago Title furthered Stewart Title's business or fell within the scope of her employment at Stewart Title. *See Wiper,* 152 Ariz. at 310, 732 P.2d at 201. Therefore, we affirm the trial court's ruling as it relates to the Chaparral transaction.

¶ 26 Regarding the second summary judgment, Stewart Title is also not liable under *respondeat superior* to the Baird plaintiffs because it did not act as their title company—their transaction was handled entirely by First American Title. A continuing relationship must exist between employee and employer to impose liability on the employer. *See Loucks v. Community Home Care Services,* 209 A.D.2d 484, 618 N.Y.S.2d 826, 827 (N.Y.App.Div.1994); Restatement (Second) of Agency § 219 cmt. d.

¶ 27 We therefore reverse and remand the first and third summary judgments but affirm the second summary judgment. Regarding the Chaparral transaction addressed in the first summary judgment, we affirm the trial court's summary judgment that Stewart Title is not liable for DeAngio's actions regarding the Chaparral transaction.

¶ 28 The Winters and the NPP and CAP plaintiffs also allege conspiracy and RICO claims against Stewart Title. In the next two sections, we address these claims.

**Doctrine of conspiracy**

¶ 29 The appellants claim that DeAngio is liable for conspiracy to defraud and, therefore, Stewart Title incurs liability under *respondeat superior* for all fraud-based claims. We address Stewart Title's liability for conspiracy as it applies to each group of plaintiffs and to each summary judgment.

¶ 30 The preliminary issue is whether DeAngio herself is liable for conspiracy.

"For a civil conspiracy to occur two or more people must agree to accomplish an unlawful purpose or to accomplish a lawful object by unlawful means, causing damages." *Rowland v. Union Hills Country Club,* 157 Ariz. 301, 306, 757 P.2d 105, 110 (1988). "[A] mere agreement to do a wrong imposes no liability; an agreement plus a wrongful act may result in liability." *Elliott v. Videan,* 164 Ariz. 113, 117, 791 P.2d 639, 643 (1989) (quoting *McElhanon v. Hing,* 151 Ariz. 386, 392, 728 P.2d 256, 262 (1985)). We assume, without deciding, that DeAngio's actions in notarizing signatures she knew to be fictitious or forged, assisting Friedman in impersonating fictitious people, and backdating deeds of trust may show that she conspired with Friedman and others to further his fraud.

¶ 31 She may therefore be liable to the Winters and CAP and NPP plaintiffs because she participated directly in Friedman's fraud. She may also be liable to the Bairds, the subject of the second summary judgment, even though First American Title handled the escrow, because a conspirator is liable for any tortious act, even unknown, committed in furtherance of the conspiracy, including acts not personally committed. *See Halberstam v. Welch,* 705 F.2d 472, 481 (D.C.Cir.1983); *Beltz Travel Serv., Inc. v. International Air Transp. Ass'n,* 620 F.2d 1360, 1367 (9th Cir.1980).

¶ 32 However, the central issue remains whether Stewart Title could be liable under *respondeat superior* for DeAngio's acts in furthering the Friedman conspiracy. We find no case that holds an employer liable for its employee's acts to perpetuate a conspiracy to defraud under *respondeat superior.* The absence of such case law may result from the term "conspiracy" generally indicating vicarious liability for concerted action.[2] *See Franzi v. Koedyker,* 157 Ariz. 401, 403, 758 P.2d 1303, 1305 (1985). If Stewart Title is liable for conspiracy through *respondeat superior,* two layers or "double" vicarious liability would result: DeAngio would be liable for a concerted action she did not per-

---

2. Another reason may be that liability is generally imposed through the employer's role as a co-conspirator. Here, the appellants do not allege

and the facts do not show that Stewart Title was a co-conspirator.

sonally perform and Stewart Title would be further liable. The nexus between Stewart Title and all the appellants thereby becomes too remote.

¶ 33 We conclude that Stewart Title cannot be liable for conspiracy for DeAngio's actions relating to the Winters, Bairds and NPP and CAP plaintiffs.[3] Earlier we stated that Stewart Title may be liable to the Winters and NPP and CAP plaintiffs, the subjects of the first and third summary judgments, under *respondeat superior;* however, it is not liable for any claims based on the doctrine of conspiracy.

### RICO violations

¶ 34 Under *respondeat superior,* the appellants argue that DeAngio and, therefore, Stewart Title have committed federal RICO violations against all three groups of appellants.[4] A violation of 18 U.S.C. section 1962(c) "requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). A pattern of racketeer-

ing requires at least two acts of racketeering activity. *See* 18 U.S.C. § 1961(5). "Racketeering activity" includes mail and wire fraud and any offense punishable under federal law involving bankruptcy or securities fraud. *See Sedima,* 473 U.S. at 482, 105 S.Ct. 3275; 18 U.S.C. § 1961(1).

¶ 35 The plaintiffs must also prove that an enterprise existed, that is, "an entity must exhibit 'some sort of structure ... for the making of decisions.'" *Chang v. Chen,* 80 F.3d 1293, 1299 (9th Cir.1996) (quoting *U.S. v. Riccobene,* 709 F.2d 214, 222 (3rd Cir.1983)). Moreover, the organization must have an "existence beyond that which is merely necessary to commit the predicate acts of racketeering." *Id.* The enterprise must be an entity other than the conspiracy.

¶ 36 If we assume, again without deciding, that Friedman's partnership, the Dartmouth Group, was an enterprise under RICO that committed a pattern of racketeering,[5] we must then determine if DeAngio "conducted or participated" in the enterprise's affairs. In *Reves v. Ernst & Young,*

---

3. Moreover, *respondeat superior* requires an existing or continuing relationship for liability. If DeAngio's wrongful actions in connection with the first summary judgment appellants, the Winters, occurred while she worked at Chicago Title, Stewart Title is not liable. It also is not liable for the Baird transactions, the subject of the second summary judgment, because DeAngio did not perform any work on those transactions.

4. 18 U.S.C. § 1962. Prohibited activities
    (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to

one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.
    (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
    (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
    (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

5. The Dartmouth Group was a general partnership established by Friedman and Lynch to engage in real estate investment. It conducted *other business besides the real estate transactions* in question. Therefore, it is a separate entity from the conspiracy and, most likely, an enterprise under RICO. The trial court did not hear evidence as to whether the Dartmouth Group committed a pattern of racketeering.

507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Supreme Court adopted the "operation or management test" to define "conduct or participate." To violate section 1962(c), the defendant "must have *some* part in directing the enterprise's affairs." *Id.* (emphasis in original). Liability may extend to any person employed or associated with the enterprise if such a person participates in the enterprise's operation or management. *Id.* at 184–85, 113 S.Ct. 1163.

¶ 37 No evidence exists that DeAngio participated in the operation or management of the Dartmouth Group. She was, as Friedman stated, a "facilitator," but no evidence exists that she was employed by the Dartmouth Group or participated in or directed its decisions. Providing some services to the enterprise does not create RICO liability. *See University of Maryland v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3rd Cir.1993) (defendant, an accounting and financial services company that allegedly performed misleading financial audits, did not participate in the affairs of the enterprise under section 1962(c)); *Biofeedtrac, Inc. v. Kolinor Optical Enterprises & Consultants, S.R.L.*, 832 F.Supp. 585, 591 (E.D.N.Y.1993) (attorney who provided questionable legal advice should not be held RICO liable). We conclude that DeAngio is not liable under section 1962(c) for RICO violations and, thus, neither is Stewart Title.

¶ 38 However, DeAngio may be liable under RICO's conspiracy section, section 1962(d), which makes it unlawful for a person to conspire to violate sections 1962(a), (b) or (c), even if she was not liable under section 1962(c). *See Salinas v. U.S.*, 522 U.S. 52, 59, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). However, if she is liable, we conclude Stewart Title is not similarly liable under section 1962(d).

¶ 39 The federal circuits are split as to whether the *Reves'* management and control test applies to a RICO conspiracy.[6] In *Salinas*, the Supreme Court did not directly address the *Reves'* test but stated that a person need not personally commit two predicate acts to be liable under section 1962(d). *See* 522 U.S. at 64, 118 S.Ct. 469. "A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Id.* at 63, 118 S.Ct. 469. Conspirators are liable for the acts of their co-conspirators who agree to pursue the same criminal objective. *Salinas* supports the rule adopted by the majority of circuit courts that a person need not participate in the enterprise's operation or management to be liable for a RICO conspiracy.

¶ 40 Thus, DeAngio may be liable under section 1962(d) if the evidence shows that she agreed to facilitate some of the acts leading to the substantive offense. *See id.* She may be a conspirator without committing an overt act as long she intends "to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that [she] adopt the goal of furthering or facilitating the criminal endeavor." *Id.* at 65, 118 S.Ct. 469.

¶ 41 The issue then becomes whether Stewart Title can be liable for DeAngio's violation of section 1962(d). The *Reves* test does not apply to Stewart Title because it is not a co-conspirator and, therefore, any possible liability must stem from *respondeat superior*. Some federal courts have held an employer liable under *respondeat superior* for its employee's violations of section 1962(c) "when the employer is distinct from the enterprise." *Brady v. Dairy Fresh Products Co.*, 974 F.2d 1149, 1154 (9th Cir.1992); see also *Petro–Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349, 1358 (3rd Cir.1987); *Davis v. Mutual Life Ins. Co. of New York*, 6

---

**6.** The Second, Fifth, Seventh, and Eleventh Circuits conclude that the *Reves* test does not apply to section 1962(d). *See e.g., United States v. Quintanilla*, 2 F.3d 1469, 1484–85 (7th Cir.1993) ("*Reves* addressed only the extent of conduct or participation necessary to violate a substantive provision of the statute" not the conspiracy principles of section 1962(d)); *accord Napoli v. United States*, 45 F.3d 680, 683–84 (2nd Cir.1995);

*United States v. Posada–Rios*, 158 F.3d 832, 857 (5th Cir.1998); *United States v. Starrett*, 55 F.3d 1525, 1547 (11th Cir.1995). The Third and Ninth Circuits disagree and find that it must apply to a RICO conspiracy. *See United States v. Antar*, 53 F.3d 568, 581 (3rd Cir.1995); *Neibel v. Trans World Assurance Co.*, 108 F.3d 1123, 1128 (9th Cir.1997).

F.3d 367, 379–80 (6th Cir.1993).[7] However, neither the federal nor state courts have addressed whether an employer can be liable for an employee's violation of section 1962(d), conspiracy to commit RICO violations.

¶ 42 *Respondeat superior* serves two goals: 1) it encourages employers to monitor the activities of their employees to ensure they are uninvolved in racketeering activities, and 2) it forces employers that benefitted from their employees' RICO violations to compensate the victims. *See Brady,* 974 F.2d at 1153–55. Those same goals are met if an employer is held vicariously liable under sections 1962(c) and (d). The Supreme Court has also stated that the general tenets of conspiracy law apply to RICO. *See Salinas,* 522 U.S. at 59–65, 118 S.Ct. 469. A civil conspiracy requires an underlying tort which the alleged conspirators agreed to commit. Conspiracy serves as a device to impose vicarious liability for the underlying tort on all who commonly plan, take part in, or cooperate in the wrongdoers' acts.

¶ 43 If Stewart Title were liable under *respondeat superior* for DeAngio's acts to perpetuate a conspiracy to defraud,[8] double vicarious liability would result. DeAngio's actions are already removed from that of her co-conspirators (although she is still liable for their misconduct), and Stewart Title's conduct, whatever it be, is even more distant. We therefore conclude that Stewart Title is not vicariously liable to any of the three groups of appellants for DeAngio's conspiracy to commit RICO violations.

**Attorneys' Fees**

¶ 44 The trial court granted attorneys' fees to Stewart Title because it found appellants' arguments to be groundless. We disagree given the complexity of the appellants' arguments and the split among federal circuits about these RICO issues. For this

reason and because we are reversing two of the three summary judgments, we vacate the trial court's award of attorneys' fees.

**CONCLUSION**

¶ 45 We affirm the trial court's second summary judgment against the Baird plaintiffs. Stewart Title is also not liable for DeAngio's actions in connection with the Chaparral transaction, addressed in the first summary judgment. It cannot be held liable for unconnected transactions performed by another title company under *respondeat superior* or common law conspiracy.

¶ 46 We reverse and remand the first and third summary judgments against the Winters and CAP and NPP plaintiffs respectively because DeAngio handled the paperwork and escrows for these plaintiffs while employed at Stewart Title, generating possible liability under *respondeat superior* for negligence or fraud. Stewart Title has no liability under conspiracy or RICO claims. We vacate the trial court's award of attorneys' fees.

CONCURRING: PHILIP E. TOCI, Presiding Judge, and E.G. NOYES, JR., Judge.

---

7. Other circuit courts do not follow this approach and find that the doctrine of *respondeat superior* conflicts with section 1962(c). *See Schofield v. First Commodity Corp. of Boston,* 793 F.2d 28, 32–34 (1st Cir.1983); *Luthi v. Tonka Corp.,* 815 F.2d 1229, 1230 (8th Cir.1987).

8. The appellants urge us to find Stewart Title vicariously liable for DeAngio's acts to further the conspiracy. However, the case law cited is

unpersuasive and distinguishable because some involve partnerships, *see Elliott v. Videan,* 164 Ariz. 113, 791 P.2d 639 (1989), *United States v. Heffner,* 916 F.Supp. 1010 (S.D.Cal.1996), while others involve the Sherman Anti-Trust Act, *see Nurse Midwifery Associates v. B.K. Hibbett, M.D.,* 689 F.Supp. 799 (M.D.Tenn.1988), *rev'd on other grounds,* 918 F.2d 605 (6th Cir.1991).