**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SOUTHERN UNION COMPANY, a
Delaware corporation,
              *Plaintiff-Appellee,*

              v.

SOUTHWEST GAS CORPORATION, a
California corporation; ONEOK INC.,
an Oklahoma corporation;
MICHAEL MAFFIE; THOMAS
HARTLEY; GENE DUBAY; THOMAS
SHEETS; JOHN GABERINO; JACK D.
ROSE; EDWARD ZUB; LARRY W.
BRUMMETT,

              *Defendants,*

              and

JAMES M. IRVIN,
              *Defendant-Appellant.*

No. 03-16649

D.C. Nos.
CV-99-01294-ROS
CV-00-00119-ROS
CV-00-00452-ROS
CV-00-01812-ROS
CV-00-01775-ROS

13359

SOUTHERN UNION COMPANY, a
Delaware corporation,
            *Plaintiff-Appellant,*

                v.

SOUTHWEST GAS CORPORATION, a
California corporation; ONEOK INC.,
an Oklahoma corporation;
MICHAEL MAFFIE; THOMAS
HARTLEY; GENE DUBAY; THOMAS
SHEETS; JOHN GABERINO; JACK D.
ROSE; EDWARD ZUB; LARRY W.
BRUMMETT,

                    *Defendants,*

            and

JAMES M. IRVIN,
            *Defendant-Appellee.*

No. 03-16729

D.C. Nos.
CV-99-01294-ROS
CV-00-00119-ROS
CV-00-00452-ROS
CV-00-01812-ROS
CV-00-01775-ROS

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, District Judge, Presiding

Argued and Submitted
May 10, 2005—San Francisco, California

Filed July 13, 2005
Filed September 16, 2005

Before: Stephen Reinhardt, John T. Noonan, and
Ferdinand F. Fernandez, Circuit Judges.

Opinion by Judge Noonan;
Partial Concurrence and Partial Dissent by Judge Fernandez

**COUNSEL**

Tom Q. Ferguson, Tulsa, Oklahoma, for plaintiff-appellee-appellant Southern Union Company.

Barry Richard, Tallahassee, Florida, Elliot H. Scherker, Miami, Florida, for defendant-appellant-appellee James M. Irvin.

**ORDER**

The opinion filed on July 13, 2005 is amended as follows:

Slip Op. p.8157, ¶ 2, l.2: Before sentence beginning: "Despite this holding . . . ." add the following:

"Although the district court ruled that Irvin was not at all entitled to an instruction derived from *Crum*, the course and scope instruction that Irvin proposed was deficient under Arizona law and could have still been rejected."

Slip Op. p.8157, ¶ 2, l.1: Amend sentence beginning: "Despite this holding . . ." to begin: "Despite this court's holding on the course and scope instruction,"

Slip Op. p.8158, ¶ 1, l.9. Add after "1116 (2000)":

"Moreover the jury was instructed in detail about the scope of the ACC's authority and the duties inhering therein, and the jury nevertheless concluded that Irvin had acted improperly."

With these amendments, the panel has voted unanimously to deny the petition for rehearing.

The full court has been advised of the petition for rehearing en banc, and no active judge has requested a vote whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing is DENIED and the petition for rehearing en banc is DENIED.

No further petitions for rehearing and for rehearing en banc will be entertained.

---

## OPINION

NOONAN, Circuit Judge:

James M. Irvin, a citizen of Arizona, appeals the judgment of the district court in favor of Southern Union Company, a Delaware corporation, on Southern Union's claims of tortious interference with a business expectancy and tortious interference with contractual relations, as a result of which Southern Union was ultimately awarded $390,072 in compensatory damages and $60,000,000 in punitive damages. Southern Union cross-appeals the district court's decision to keep its claim of lost profits from the jury.

We hold, first, that the appeals were timely filed; second, that the compensatory damage award should be affirmed; and third, that the punitive damages are constitutionally disproportionate to the harm found.

*Jurisdiction*. The case was brought by Southern Union under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, and as a suit asserting diversity jurisdiction under 28 U.S.C. § 1332. In the course of the

proceedings, various defendants settled with Southern Union; the RICO claim dropped out; and only the business and contract torts went to the jury. In this court, our first question is the timeliness of Irvin's appeal; the timeliness of Southern Union's cross-appeal is dependent on our finding Irvin's appeal timely. We state the facts relevant to this issue.

On December 18, 2002, the jury returned its verdict in favor of Southern Union. The jury awarded damages of $975,181 on the contract claim, with 40% liability assigned to Irvin. The jury awarded $975,181 on the business relationship claim with 20% liability assigned to Irvin. The jury awarded $60 million in punitive damages. On January 9, 2003, Irvin moved for judgment notwithstanding the verdict (JNOV) or in the alternative for a new trial or remittitur. On January 24, 2003, the district court issued a ruling as to the proposed form of judgment, taking into account that the jury had assigned different percentages of responsibility to Irvin for the two torts for which the jury held him responsible. The court ruled that the two percentages should be averaged to determine Irvin's liability. On June 2, 2003, the district court denied Irvin's motion for JNOV. On July 28, 2003, the district court again denied Irvin's motion for JNOV and also his motion for a new trial or remittitur. This order, in its entirety, read:

> Pending before Court is Defendant Irvin's Amended Motion for JNOV or in the Alternative for New Trial or Remittitur. The Court has reviewed the briefing, and will deny the motion. A written opinion will follow early next week.
>
> Accordingly,
>
> IT IS ORDERED that Defendant Irvin's Amended Motion for JNOV or in the Alternative for New Trial or Remittitur is DENIED.
>
> DATED this 25 day of July, 2003.

This order was communicated to counsel and docketed on July 28, 2003.

On July 31, 2003, the district court signed a second Order which dealt with Irvin's two post-trial motions, analyzed them in detail, and denied them. This order was docketed August 1, 2003.

On August 14, 2003, the district court signed what it termed "Final Judgment." It read, in its entirety, as follows:

> These consolidated actions came on for jury trial on October 29, 2002, the Honorable Roslyn O. Silver presiding. On December 18, 2002, all remaining matters having been duly tried and submitted to the jury, the jury rendered its verdict in matter CIV-99-1294-PHX-ROS. Judgment is hereby entered in favor of Southern Union Company and against Defendant James M. Irvin as follows: (1) On Southern Union's claim for intentional interference with contract, the sum of $975,181.46, adjusted by relative degrees of fault to $390,072.58; (2) On Southern Union's claim for intentional interference with business expectancy, the sum of $975,181.46, adjusted by relative degrees of fault to $195,036.29; (3) The higher amount of $390,072.58 constitutes the total actual damages assessed against Defendant Irvin, and in favor of Southern Union; (4) Punitive damages in the sum of $60,000,000.00; (5) Its cost of suit as taxed by the Clerk and as approved by the Court.
>
> DATED this 14 day of August, 2003.

This order was docketed August 18, 2003. Irvin's Notice of Appeal was filed August 29, 2003, within 30 days of the entry of this judgment.

**[1]** Southern Union argues that Irvin was late; the appeal deadline was August 28, 2003, thirty days from the entry of the judgment of July 28. Southern Union relies on Federal Rules of Appellate Procedure (FRAP) 4(a)(4)(A), which reads as follows:

> (4) Effect of a Motion on a Notice of Appeal.
>
>    (A) If a party timely files in the district court any of the following motions under the Federal Rules of Civil Procedure, the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion:
>
>       . . .
>
>       (v)   for a new trial under Rule 59 . . .

Read literally, the rule applies. The district court on July 28, 2003 entered its order disposing of Irvin's motion for a new trial. The appeal period expired August 28, 2003.

**[2]** We do not believe that the rule was intended to work in this way. On July 28, 2003, final judgment including the damages had not yet been entered. What would Irvin have appealed? In *Alice in Wonderland*, the rule is "Sentence first — Verdict afterwards." We could read our rule to mean Appeal first, Judgment afterwards. But we are not in Wonderland. Irvin's appeal was timely, as was Southern Union's, which was filed on September 12, 2003.

Having determined that we do have jurisdiction, we turn to the merits of the two appeals.

## FACTS

James M. Irvin was elected in January, 1997 to be one of the three commissioners of the Arizona Corporation Commis-

sion (the ACC). This body regulates energy companies in Arizona and has the power to approve or disapprove mergers of such companies. Ariz. Rev. Stat. § 38-431; Ariz. Const. art. XV, 4-5. Irvin became chairman in November 1997 and served in this capacity until May 1999. Jack D. Rose was a lawyer and friend of Irvin and had worked on Irvin's campaign for election to the ACC. In June 1997, Irvin nominated him to be Executive Secretary of the ACC. Rose served in this capacity until December 31, 1998. Irvin and Rose became defendants in this case because of their relationship to the merger deliberations of Southwest Gas Company (SWG).

On December 14, 1998, SWG announced its agreement to merge with ONEOK, Inc., an appropriate acronym for One-Oklahoma, a leading Oklahoma natural gas company. The price offered by ONEOK was $28.50 per share of SWG stock. The parties agreed that a competing offer at a higher price would entitle SWG to consider the higher offer. On February 1, 1999, Southern Union offered SWG $32 per share on terms otherwise the same. The value of this offer was $108,000,000 over ONEOK's. If accepted, the deal would have created the largest natural gas utility in the United States. Any merger had to be approved by the ACC and by the appropriate regulatory authorities in California, Missouri, and Nevada.

On February 21, 1999, the SWG board unanimously determined that Southern Union's offer was a "Superior Proposal" as defined in the merger agreement with ONEOK. That determination meant that Southern Union's financial plan was "viable"; that "the deal was doable"; and that Southern Union could get regulatory approval. SWG was therefore free to negotiate with Southern Union. Irvin and Rose, however, worked to defeat Southern Union's proposal.

On December 28, 1998, Rose, still the Executive Secretary of the ACC, sent a business proposal to Prudential Securities, Inc. (PSI), a New York investment house and wholly owned subsidiary of the Prudential Insurance Company of America.

Rose wrote: "Last week Southwest Gas Corporation announced that it is being bought out in an all cash transaction. Given my relationship with this company and my ability to advise them on important regulatory issues related to the merger, I believe that I am well positioned to get some of the underwriting business." Neither Rose as a regulator nor PSI as an underwriter seemed aware of the implications of a regulator touting his ability to obtain business from a company within his jurisdiction.

On December 31, 1998, Rose resigned as Executive Secretary. On January 2, 1999, he was hired at the ACC by Irvin as a "Loaned Executive," without the knowledge or approval of other ACC commissioners.

On February 12, 1999, Irvin called Larry Brummett, chairman of ONEOK, and told him that he didn't want a bidding war between ONEOK and Southern Union and that he wanted to write SWG. A few days later, Rose, with Irvin's approval, traveled to Oklahoma and met Brummett. Brummett agreed that Rose could set up a meeting between representatives of PSI and ONEOK. February 23, 1999, the day after Southern Union's offer became public, Rose called PSI and told them that he was advising the chairman of ONEOK on the proposed merger and would arrange for PSI people to meet the CEO and CFO of ONEOK. On March 2, 1999, Rose met with John Gaberino, general counsel of ONEOK. The next day, Gaberino and Rose met with Irvin, who told Gaberino that Rose had given him a good report on ONEOK and that Irvin intended to contact the other two relevant regulatory bodies, the California Public Utilities Commission (the CPUC) and the Public Utilities Commission of Nevada (the PUCN). Two days later, March 5, 1999, Gaberino and another lawyer for ONEOK worked on a letter for Irvin to send to the board of SWG. Gaberino went over the text of this letter with Rose. This letter (the Rose-Irvin letter) was to become an instrument in Irvin's interference with the proposed Southern Union merger.

On March 9, 1999, J. David Dubin of PSI sent an email to Joseph Sebastian Fichera, a managing director of the same company. This communication was titled "Referral Business Opportunity Through Jack Rose." Referring to Rose, Dubin stated:

> 3. Jack says that the Company's CEO has a strong motive for wanting to reward him presumably for his work in helping the Company obtain favorable regulatory action from the ACC during his tenure as its chief executive. He would like to pursue the Transaction on behalf of PSI and is confident that he can persuade the Company to name PSI as a managing underwriter.
>
> 4.   Jack is concerned, however, about using up his goodwill with the CEO to obtain an engagement in which the fee income to IBG [= Investment Banking Group or underwriter] will be modest in comparison to the fees IBG would collect (and that he in turn would share) as an advisor on an acquisition. Hence, Jack has proposed that he and PSI enter into a finder's fee arrangement under which his contingent payout would be larger if he can deliver a more lucrative appointment for PSI. Specifically, he would propose the following percentage payouts of the fee income booked by IBG on the Transactions:
>
> A.   For appointment as a Co-Manager.      15% of IBG fee income
>
> B.   For appointment as a Senior Manager  33% of IBG fee income
>
> C.   For appointment as Sole Manager      40% of IBG fee income.
>
> . . . .

6.   Time is of the essence. Jack's telephone in Phoenix is 602-906-9007.

On March 10, 1999, Fichera passed this information on to another executive at PSI:

A person we met on the Administrative Securitization trail in Arizona says he can help deliver a significant piece of business to us. The client, he told us today, is Oneok, a major midwestern gas company (Carol Coale does not cover them though she tracks them). We do not have a relationship with this firm (last WARP call date 5/95 from someone no longer here). It is an A rated company and someone we would like to do business with. He is willing to work completely on the come___no deliver, no pay. But, if he does deliver, he wants to be paid big time (see below).

I think this is worth pursuing___it is real___ but need your guidance as to how much to compensate if he really can deliver a senior managed or sole managed deal.

We need to get back to him on Thursday AM.

On March 19, 1999, Fichera, on behalf of Prudential Securities, and Rose entered into a contract providing as follows:

Dear Jack:

This letter is to confirm our mutual understanding with respect to compensation that may be payable to you from Prudential Securities Incorporated ("PSI") with respect to certain public offerings of securities underwritten by PSI.

You agree to introduce PSI to ONEOK, Inc. and U.S. West (each a "Company") and to assist PSI in

securing the engagement of PSI by each Company (collectively, the "Introduction"). If during the next 24 months either Company consummates a public offering of its securities in which PSI acts as a managing underwriter (a "PSI Underwritten Offering"), PSI will pay to you a fee (the "Fee") based on a percentage of the management fee paid to PSI with respect to such PSI Underwritten Offering according to the following schedule:

| *Capacity of PSI* | *Percentage of Management Fee* |
| --- | --- |
| Co-Manager | 15% |
| Lead Manager or Co-Lead Manager | 30% |
| Sole Manager | 35% |

The Fee shall be paid to you within 30 days of the receipt of the management fee by PSI, provided that such Fee is not prohibited by law. PSI will only be obligated to pay you a Fee hereunder when the entire fee payable to PSI with respect to a PSI Underwritten Offering has been received by PSI free of adverse claim.

PSI shall reimburse you periodically for your reasonable, out-of-pocket travel and lodging expenses incurred with PSI's prior consent in connection with the Introduction.

Although only the proposed merger of ONEOK and U.S. West was referred to, this agreement, it could be inferred, was also to govern an ONEOK merger with SWG. A series of telephone calls between Rose and Irvin punctuated Rose's negotiations with PSI.

Rose and Irvin were at work even before Rose's contract was signed. In a memo dated March 16, Mark Dioguardi, a lawyer for ONEOK, had noted: "Letter from one or more Chair would sink [Southern Union]." On that date, Irvin and Rose were in San Francisco. Their trip was unknown to the ACC, and their expenses were not charged to it. In San Francisco they met with members and staff of the CPUC. According to Harvey Morris, who attended the meeting as counsel for the CPUC, Irvin and Rose together conducted a lobbying campaign for ONEOK. They presented the Rose-Irvin letter criticizing a SWG—Southern Union merger, stated that Southern Union would have to issue junk bonds to finance the merger, and added that Southern Union's debt-equity ratio would become 80-20. The meeting began and ended with Irvin and Rose urging the CPUC to send the Rose-Irvin letter to SWG. Everything said about Southern Union by the two Arizonans was negative.

On March 23, 1999, Irvin and Rose traveled to Reno, Nevada and the following day met with Judy Sheldrew, the chair of the PUCN. Irvin introduced Rose to talk about the SWG merger proposals. Rose told her that ONEOK was by far the superior candidate. Irvin urged her to have the Nevada commission issue the Rose-Irvin letter to SWG that he had urged upon the CPUC.

On March 25, 1999, Irvin and Rose met with Kenneth Guinn, the governor of Nevada and a former chairman of SWG. They urged him, too, to send a negative letter to SWG regarding Southern Union's offer. Governor Guinn declined to do so but, instead, called the CEO of SWG and advised him to "read between the lines" of the letter he would receive from Irvin. The Rose-Irvin letter was faxed to SWG by Irvin on April 5, 1999 from his office at the ACC. It was signed by him alone.

April 5 was the same day the SWG board was to meet to discuss the competing merger offers. After faxing his letter,

Irvin moved to Rose's home and from there called the CEO of SWG. Irvin told him that it was highly unlikely that a SWG-Southern Union merger would be approved by the ACC and that the California commission was equally concerned about that proposal. This telephone call was tape-recorded and played to the board of SWG. Copies of the Rose-Irvin letter were distributed to the board. Members of the board saw the regulators' position as a big problem in the way of accepting Southern Union's higher offer.

On April 12, 1999, Fichera of PSI and Rose met with officials of ONEOK, who indicated their readiness to do business with PSI. Thereafter Rose sent PSI an amendment to their agreement of March 19, 1999. Whereas the split of "any customary M&A advisory fee" on the ONEOK-U.S. West merger gave only 35% to Rose, the amendment proposed the split of the advisory fee on an ONEOK-SWG merger in this way: "2/3rds to Rose and 1/3rd to Prudential up to $3 million and 80% to Rose and 20% to Prudential for any fees in excess of $3 million." Rose's proposal was formally accepted by PSI in a contract signed by Fichera and dated June 22, 1999.

On April 26, 1999, SWG announced that it had rejected Southern Union's offer. The press release of SWG announced that its board "believes that Southern Union would have a more protracted and difficult time in obtaining regulatory approvals, extending eighteen months or longer." SWG went ahead with ONEOK.

Rose guided ONEOK through the regulatory process and was congratulated by ONEOK for his help. ONEOK prepared a $300 million debt offering to finance the merger with SWG. PSI was to be a manager of the underwriting. Rose, however, did not collect his commission. Shortly after Southern Union filed its complaint in this case in July 1999, ONEOK canceled the offering. After Southern Union had conducted discovery in this case and in the course of it gained knowledge of PSI's

agreement with Rose on the fees he would earn, ONEOK withdrew entirely from the merger.

## PROCEEDINGS

On July 19, 1999, Southern Union filed its complaint in this case. Its second amended complaint, filed July 25, 2000, was the operative basis of the trial. Before trial, on December 15, 2000, the district court dismissed the RICO claims on the ground that they constituted a securities fraud claim and were therefore barred by the Private Securities Litigation Reform Act of 1995, 18 U.S.C. § 1964(c).

In 2001, the multiple defendants moved for summary judgment. On January 4, 2002, the district court entered a comprehensive order disposing of these motions. We note the relevant rulings. (1) Granted was a motion to deny Southern Union the right to present a jury with evidence of its lost profits. (2) Denied was a motion for summary judgment by Jack Rose. The court observed that Rose had invoked his privilege against self-incrimination as to the matters at issue and that his invocation of the privilege in a civil suit left the fact-finders free to draw adverse inferences against him. (3) Denied was a motion for summary judgment by ONEOK, the court ruling that "ONEOK's characterization of the evidentiary record is demonstrably false." After discovery and various motions, on October 29, 2002, a jury of nine was selected, sworn, and empaneled.

Prior to trial, an incident occurred that made a sharp impression on the district court and is best presented in the judge's own words as she reviewed Irvin's post-trial motion for remittitur: Irvin participated in a "scheme to impede the jury's search for truth at trial." The scheme involved his wife, Carol, fabricating notes of a telephone call of July 31, 1999, between herself and Jack Rose; in the conversation Rose appeared to exculpate Irvin from any charge of wrongdoing. Irvin gave the notes to his counsel, who presented them to the

court. When counsel for Southern Union obtained the opportunity for its forensic examiner to inspect the notes, Irvin's counsel admitted that the notes were not contemporaneous with the telephone call but had just recently been written; he withdrew his proffer of the notes. Southern Union then moved to admit the notes as evidence of Irvin's intentional fabrication of evidence. The court granted the motion.

After nearly two months of trial, the jury returned its verdict. The subsequent proceedings and the appeals have already been noted.

## ANALYSIS

**[3]** *Evidence supporting the verdict.* Irvin continues to argue that he is entitled to JNOV because Southern Union failed to show that his efforts caused SWG to reject its offer. He cites the testimony of a pair of SWG officers who had doubts about Southern Union's offer, but each of these witnesses tied their doubts to difficulties the regulators might raise. Some members of SWG's board did not think Irvin's interventions significant. Others did. That adverse inferences could be drawn against Rose has already been observed. Some of the strongest evidence from which the jury could draw inferences was the value ONEOK placed on Rose's services and relationship with Irvin as well as Rose's own high evaluation of his help after the April 5, 1999, meeting of the SWG board. Enough evidence was presented to the jury for it to find that Irvin caused at least 40% of the harm to Southern Union by interfering with its contractual relations; his interference was a significant cause. *Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1023-24 (9th Cir. 2000) (as amended) (citing *Wagenseller v. Scottsdale Mem'l Hosp.*, 710 P.2d 1025, 1041 (Ariz. 1985).

**[4]** *Irvin's scope of authority defense.* Under Arizona law, a statute regulates claims against public employees such as Irvin. Ariz. Rev. Stat. § 12-821.01(A). It applies if the suit is

against the employee in his public capacity and is directed to cases making claims against the employee's public employer. *Id.*

**[5]** Irvin has found a decision of an intermediate Arizona court that he contends fits his case:

> [I]t is unnecessary for the claimant to sue the employer or file a notice of claim against either the individual public employee or the employer. Instead, in such a case the issue of whether the defendant was acting within the course and scope of his employment remains to be decided by the trier of fact, and a plaintiff who fails to file a notice of claim does so at his own risk. The parties have not reached the point in the proceeding at which it is appropriate to raise and decide the question whether the acts were done in the scope of Crum's employment, but it is clear that it cannot be resolved on a motion to dismiss. In any event, if the plaintiff does not file a notice, and the finder of fact concludes that the defendant was acting within the course and scope of his employment, the plaintiff cannot have judgment against the defendant.

*Crum v. Super. Ct.*, 922 P.2d 316, 318 (Ariz. Ct. App. 1996).

**[6]** A majority of this court holds that, under the rule stated in *Crum*, Irvin was entitled to have the jury consider his defense that his actions were within the scope of his duties as a member of the ACC. Although the district court ruled that Irvin was not at all entitled to an instruction derived from *Crum*, the course and scope instruction that Irvin proposed was deficient under Arizona law and could have still been rejected. Despite this court's holding on the course and scope instruction, a different majority concludes that the instructional error was harmless. Assessing punitive damages of $60 million against him, the jury provided "a strong indication"

that it disbelieved Irvin's account of what he was up to. *Larez v. Holcomb*, 16 F.3d 1513, 1518 (9th Cir. 1994). Southern Union's view of the facts, accepted by the jury, was that Irvin's acts were connected with his official duties only as much as a judge accepting a bribe to decide a case in favor of the briber would be engaging in conduct connected to his duty as a judge. Large punitives are "evidence that an erroneous jury instruction was harmless." *See Swinton v. Potomac Corp.*, 270 F.3d 794, 806 (9th Cir. 2001), *cert. denied*, 535 U.S. 1018 (2002). In short, the award here "makes it quite plain" that the jury would have come to the same conclusion even if the *Crum* instruction had been given. *Lambert v. Ackerley*, 180 F.3d 997, 1009-10 (9th Cir. 1999) (*en banc*), *cert. denied*, 528 U.S. 1116 (2000). Moreover the jury was instructed in detail about the scope of the ACC's authority and the duties inhering therein, and the jury nevertheless concluded that Irvin had acted improperly.

**[7]** *The punitive damages*. Sixty million dollars in punitives after an award of compensatory damages against Irvin of $390,072! The ratio of over 153 to 1 immediately commands our attention. It cannot survive the constitutional scrutiny required by the Supreme Court. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003).

**[8]** No bright line has been set beyond which punitives may not go. *Id.* at 425. But we have been reminded that, under established principles, few awards exceeding a single digit ratio to a significant degree "will satisfy due process." *Id.* Even an award more than four times the amount of compensatory damages "might be close to the line of constitutional impropriety." *Id.* History points to double, triple, or quadruple punitives; these ratios "are instructive." *Id.* In the light of these admonitions and suggested boundaries, we review the jury award and the judge's ruling sustaining it.

**[9]** " 'The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility

of the defendant's conduct.' " *Id*. at 419 (quoting *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996)). Briefed on *Campbell*, the district court properly looked first at this factor. The court found Irvin's conduct to be "marked by two factors: repeated actions and harm caused by intentional trickery and deceit." Irvin, the court stated, had abused his powers as a commissioner "in favor of the private interests of a specific utility company, ONEOK, and his personal interests . . . ." Harm to Southern Union was inflicted by Irvin by his letter and his telephone call to the April 5, 1999 board meeting of SWG and by his instigation of Governor Guinn's call. This actual harm was the culmination of two months of planning and activity directed to blocking the proposed Southern Union merger.

Irvin's purposeful persistence in this effort, the district court found, was matched by his efforts at concealment. As far as possible, his activities to block the merger were kept from his fellow commissioners, and, the court added, "afterwards he covered up his wrongdoing to ensure the outcome of the scheme."

When Southern Union challenged him and began litigation, Irvin's effort at concealment continued: "he persevered in hiding his wrongful acts throughout the trial and in particular while testifying in Court before the jury." The court marked as "particularly egregious" Irvin's manufacture of evidence — the fabricated notes of his wife's telephone conversation with Rose, which Irvin persuaded his counsel (paid for him by the state of Arizona) to present as genuine to the court. The court found this "intentional fabrication of evidence" by Irvin to show his consciousness of guilt and to go to the reprehensibility of his conduct.

The district court noted that neither *Campbell* nor *Gore* considered reprehensible conduct by a public official. The court noted that significant consideration must be given to the nature of the public trust embodied in the public office the

official held. The court noted the broad power of the ACC, which the Supreme Court of Arizona said was "treated as a fourth branch of government in Arizona." *Polaris Int'l Metals Corp. v. ACC*, 652 P.2d 1023, 1029 (Ariz. 1982).

The court turned to the award of punitives in civil rights cases under 42 U.S.C. §§ 1981 and 1983 where the ratio of punitives to actual damages far exceeded a single digit ratio. Indeed nominal damages had been held sufficient to support the award of punitives against a public officer. *Gill v. Manuel*, 488 F.2d 799, 802 (9th Cir. 1973). In holding that municipalities are exempt from punitives in civil rights cases, the Supreme Court noted that effective deterrence was achieved by the assessment of punitives against the offending official. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 269-70 (1981). The district court held that the single digit ratio was not the right measure from harm by a public official abusing his trust.

[10] The district court was right in seeing reprehensible conduct by a public official as presenting an issue not addressed by *Gore* and *Campbell*. It was, however, we believe, mistaken in using awards in civil rights causes as a bench mark. The redress of racial, religious or gender discrimination has been treated as a special area of public concern where affront to human rights may require high punitives. *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020, 1043 (9th Cir. 2003), *cert. denied*, 541 U.S. 902 (2004). We do not believe that the civil rights case ratios apply to a case brought as a private tort action.

[11] We do not mean to minimize the magnitude of Irvin's exploitation of his office. The jury was entitled to consider how he worked hand in glove with Rose and what this cooperation meant in securing for Rose 66-2/3% of the underwriting management fee up to $3 million and 80% of the fee beyond $3 million. That no payoff could be shown was because the grateful underwriter withdrew as this litigation

went on. Nothing in Irvin's extraordinary efforts suggests that he was motivated only by a selfless desire to enrich Rose.

**[12]** The failed plan to introduce fabricated evidence also did not bring a profit to Irvin, nor, since it failed, did it do any economic harm. Nonetheless, this shady strategy could appropriately enter the jury's calculation. *See United States v. Perkins*, 937 F.2d 1397, 1401-2 (9th Cir. 1991). In addition, Irvin was observed at his ACC office destroying documents subpoenaed by the plaintiff, and his secretary had her hard drive reformatted. In court, Irvin repeatedly denied evidence of his misconduct, to the extent that the district court found his testimony to be part of his reprehensible conduct. As his document destruction was incomplete and as his words under oath did not convince the jury, no economic harm was done by them. They were grave injuries to the judicial process.

**[13]** To sum up our view of the punitives, the ratio to actual damages is too high. The noneconomic damage to the judicial process and the exploitation of high public office were properly taken into account. We vacate the award, remanding for the district court to offer the option of a remittitur or a new trial on the punitives. We leave to the discretion of the district court the ratio to be set if it orders remittitur.

**[14]** *Southern Union's appeal*. The district court found that Southern Union offered "insufficient evidence to establish the terms of a consummated merger with Southwest." Although Southern Union points to evidence to the contrary, we are unwilling to reverse the well-informed trial judge on this close question, especially as a new trial on the alleged lost profits would, at most, lead to the award of damages not likely to be collected.

**[15]** *Conclusion*. The award of punitive damages is vacated and this issue is remanded to the district court with instruction to order a remittitur or a new trial on this issue.

The judgment against Irvin for compensatory damages is affirmed. Southern Union's cross-appeal is denied.

03-16649—Affirmed in part, vacated in part, and remanded.

03-16729—Affirmed.

---

FERNANDEZ, Circuit Judge, Concurring and Dissenting:

I dissent in part because I believe that a new trial is required, although, as I will note, I also concur in part because I do agree with certain portions of the majority opinion.

A.   *Jurisdiction*

I do agree with the majority's pithy opinion that we have jurisdiction over this appeal and that a contrary rule would approach parody. Still and all, at the risk of being unduly prolix, I will say a few more words about my reasons for agreeing on this issue.

The problem we are faced with is the plain language of Fed. R. App. P. 4. While it is usually thought that a party's time to file a notice to appeal does not start to run until a judgment is filed, the rule itself does not say so on its face. Its plain language states that the time starts to run upon the entry of the judgment appealed from except as provided in Rule 4(a)(4). *See* Rule 4(a)(1)(A). But Rule 4(a)(4)(A) says that the time runs from the date that certain posttrial motions are decided (entry of an order disposing of them). The plain language suggests that even if no judgment has been entered, the time starts to run when the motions are decided. Like the majority, I do not think that reading can be accepted. Why?

Pursuant to 28 U.S.C. § 1291, our jurisdiction extends to final decisions only. Thus, until there is a final decision, we cannot take jurisdiction over a case. But a party cannot have a final decision to appeal from until one is entered. (True, a party might file a notice of appeal earlier, but it is not effective. It is simply saved under Rule 4(a)(2)). Thus, the plain reading would lead to the possibility that pursuant to Rule 4(a)(4)(A) the time to file a notice to appeal would run out before there was a final judgment over which we could take jurisdiction.[1] That seems peculiar, not to mention unjust. *See Clinton v. City of N.Y.*, 524 U.S. 417, 428-29, 118 S. Ct. 2091, 2098, 141 L. Ed. 2d 393 (1998); *Pub. Citizen v. United States Dep't of Justice*, 491 U.S. 440, 452-55, 109 S. Ct. 2558, 2566-67, 105 L. Ed. 2d 377 (1989); *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 527-28, 109 S. Ct. 1981, 1994-95, 104 L. Ed. 2d 557 (1989) (Scalia, J., concurring); *Or. Natural Res. Council, Inc. v. Kantor*, 99 F.3d 334, 339 (9th Cir. 1996). Similarly, if Southern Union were correct, the time for a notice to appeal would begin to run before there was a final judgment (final decision) from which an appeal to us could actually be taken. Thus, we cannot rely on the plain language alone.

If we resort to common sense, that tells us that the idea of being forced to appeal a judgment before there is a judgment to appeal is rather incoherent. That would suggest that the possibility was never considered and that Rule 4(a)(4) was designed to extend, not limit, the appeal time set forth in Rule 4(a)(1). Not surprisingly, if we resort to the Advisory Committee notes, we can divine that they speak to the idea of postponing the notice of appeal while the motions in question are pending and mandate that one should await the decision of those. *See* Rule 4, Advisory Comm. Notes (1979 Amendment, Subdivision (a)(4)). They also look upon Rule 4(a)(4)(A) as

---

[1]In general, a judgment is the equivalent of a final decision. *See Bankers Trust Co. v. Mallis*, 435 U.S. 381, 384 n.4, 98 S. Ct. 1117, 1119 n.4, 55 L. Ed. 2d 357 (1978).

tolling the running of or extending the time to appeal. *See id.* (1993 Amendment, Note to Paragraphs (a)(1), (a)(4)).

It must be acknowledged on the other hand that Rule 4(b), which deals with criminal appeals, explicitly addresses the possibility that a judgment might be filed after certain motions are disposed of and then proceeds to declare that the time runs from the entry of the decision on the motions or entry of the judgment, whichever is later. Rule 4(b)(3). That suggests that the Rules Committee knew how to deal with the problem we face here, if it thought about it and wanted to do so. But, again, the Committee Notes regarding that provision indicate a concern that because of the unique structure of the criminal rules, the motions might actually be decided before a judgment was entered. The Committee wanted to avoid the absurdity of having the notice to appeal time run before entry of the judgment. *See* Rule 4, Advisory Comm. Notes (1993 Amendment, Note to Subdivision (b)). That rather underscores the fact that the issue was never even contemplated for a civil case like ours. In fact, the Committee stated that the problem in the criminal area was that, unlike a civil case, the time to make a motion could start running before there was an entry of judgment. *Id.* The rule responded to the mention of that difficulty in an earlier case. *See United States v. Hashagen*, 816 F.2d 899, 902 n.5 (3d Cir. 1987). Unfortunately, nobody had noted the problem for civil cases; nobody even contemplated it.

All of the above being so, I agree with the majority on the jurisdiction issue.

B.  *Merits*

I also agree with the majority that there was sufficient evidence from which a jury could hold in favor of Southern Union. Much of that is detailed in the majority opinion. Where we part company is on the question of whether the verdict can be upheld in light of the district court's failure and

refusal to give the scope of employment instruction requested by Irvin.

In my view, Southern Union's failure to give the notice required under Arizona Revised Statutes § 12-821.01(A) would be fatal to its case, if Irvin was, indeed, acting within the scope of his employment. *Crum v. Superior Court*, 922 P.2d 316 (Ariz. Ct. App. 1996), makes that clear. As *Crum* puts it: "In any event, if the plaintiff does not file a notice, and the finder of fact concludes that the defendant was acting within the course and scope of his employment, the plaintiff cannot have judgment against the defendant." *Id.* at 318.

If a plaintiff for some reason decides not to protect itself by filing an appropriate notice, that is fine, but the plaintiff then proceeds at its own peril if, as it turns out, the state officer or employee in question was acting within the scope of his employment. In that instance, the plaintiff's gamble is indeed parlous because it is not even necessary that the employee have acted from motives which are entirely and purely public service oriented, as long as at least a part of the employee's purpose was to serve his master's needs and ends. *See Smith v. Am. Express Travel Related Servs. Co., Inc.*, 876 P.2d 1166, 1170-71 (Ariz. Ct. App. 1994).

That said, Irvin was surely entitled to have a jury consider whether his actions were within the scope of his employment; if they were, due to Southern Union's failure to give the required statutory notice, a judgment could not have been rendered against him. Thus, the district court did err, but was the error prejudicial? *See Jenkins v. Union Pac. R.R. Co.*, 22 F.3d 206, 210 (9th Cir. 1994). I think it was. In my view, we cannot say that it is more probable than not that the error was harmless. *Id.*

No doubt there was evidence from which the jury could decide that Irvin was entirely outside the scope of his employment, but there was contrary evidence also. Irvin held an

important elected position as a commissioner of the Arizona Corporations Commission, which regulates energy companies in Arizona, among other things.

The Commission and its members are vested with very broad authority in their quest to benefit the public weal. In fact, the scope of the Commission's power and authority is so extensive that it has sometimes been dubbed the fourth branch of the government of Arizona. *See Ariz. Corp. Comm'n v. Superior Court*, 459 P.2d 489, 493 (Ariz. 1969). As to public service corporations, those powers include the setting of rates, the issuing of rules and regulations, the inspection of books and records, the receipt of reports, the conduct of investigations, and even the imposition of fines. *See* Ariz. Const. art. XV, §§ 3, 4, 13, 19; *see also* Ariz. Rev. Stat. § 40-202; *Ariz. Corp. Comm'n v. State ex rel. Woods*, 830 P.2d 807, 811-15 (Ariz. 1992) (detailing the provenance and history of the Commission and its power). And there can be no doubt that investigative authority, including the taking of evidence under oath, is conferred upon "each commissioner." Ariz. Rev. Stat. § 40-241.

In this case, the jury had evidence before it from which it could have determined that Irvin's actions, though misguided, were designed to further the interests of the Commission and of the State. He testified that, as he saw it, the Constitution gave him investigative powers, as it surely did. He also stated that he saw no reason why he should not share his concerns with others. His position was not simply to act as a judge; he was an investigator, an elected public official in high office, and a person who could be expected to be much more active than judges are. Furthermore, it is apparent that Irvin, rightly or wrongly, saw Southern Union as a rather undesirable company which, due to its capital structure and history, would no doubt try to save money by terminating many current employees of Southwest Gas and by degrading customer service. He was of the opinion that the company had done something like

that in another state. Moreover, there was evidence that others had the same view.

In addition, in Irvin's opinion, and there is nothing to the contrary, it was proper for an Arizona commissioner to speak to his counterparts (and others) in other affected states and to try to develop what he thought of as a regional approach to regulatory problems. It is not surprising that he advocated his view of the matter when he did so. Finally, while one can be cynical about Irvin's motivations,[2] he expressly testified that he was never promised anything of value for his activities. There is *absolutely no evidence* that he was.

Let me be clear. I do not intend this opinion to be an elogium; I do not say that Irvin's behavior deserves encomiums, but, whatever his failings, the evidence does not require the conclusion that he is a rapscallion. It should not come as a surprise to discover that a government official thought he was fulfilling the demands (or purposes) of his office when he behaved in a distasteful manner. If Irvin thought he was fulfilling the purposes of his position and acted for that reason, he surely would not be the first governmental official, even in recent times, who thought he was acting to benefit the public but did so in ways that were unacceptable, improper, and even frightening. I will leave examples of the always renascent challenges to good government in a truly free society to the memory, knowledge and intelligence of the reader.

In fine, under Arizona law at least, the evidence does not necessarily, or even particularly, show that Irvin was outside the scope of his employment when he took the actions in question here. More specifically, a jury could find that he was very misguided, but was still acting to further the interests and purposes of his employer.[3] The failure to give the jury an opportunity to so decide was prejudicial error.

---

[2]Can anybody trust a person who attempts to conceal, manufacture, and manipulate evidence after a lawsuit starts?

[3]In fact, under 42 U.S.C. § 1983, we often encounter a public officer who is acting within the scope of his employment and who has violated

Did Irvin behave as he should? Of course not; the jury has told us that. Was Irvin's conduct bad enough to deserve punishment? Of course; the jury has told us that also. But was Irvin actually flagitious? We do not know; the jury was not asked to decide that question. I would reverse and remand for a new trial.[4]

Thus, I respectfully concur in part and dissent in part.

---

another person's sacred constitutional rights knowingly or by plain incompetence. *See Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038, 97 L. Ed. 2d 523 (1987); *see also Saucier v. Katz*, 533 U.S. 194, 201-02, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001).

[4]I agree with the majority's conclusion that the punitive damage award cannot stand, although, again, if Irvin was acting within the scope of his employment, no award whatsoever would be justified.